IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| MAGDALENO GAMBOA and MARY J. GAMBOA, husband and wife, | ) ) ) | No. 30826-0-III |
| Respondents, | ) ) ) | |
| v. | ) ) | |
| JOHN M. CLARK and DEBORAH C. CLARK, husband and wife, | ) ) ) | PUBLISHED OPINION |
| Appellants. | ) ) | |

SIDDOWAY, J. — To resolve disputes over whether someone's long, unobjected-to use of a neighbor's property gives rise to a prescriptive easement, jurisdictions apply different presumptions of permissive or hostile use and treat different circumstances as overcoming or shifting those presumptions. In this prescriptive easement case the outcome does not turn on any factual dispute but instead on the proper application of the burden of proof and presumptions provided by controlling Washington cases.

For 16 years, Magdaleno (Mack) and Mary Gamboa used a gravel roadway located on the property of their neighbors, John and Deborah Clark—a roadway that the

Gamboas did not build, that they occasionally maintained (consistent with their use) but did not improve, and that they used in a manner that never interfered with the Clarks' use or ownership rights until 2008. In the action below, filed in 2009, the trial court found that there had been no dispute over use between the two families before 2008.

We view *Roediger v. Cullen*, 26 Wn.2d 690, 175 P.2d 669 (1946) and *Cuillier v. Coffin*, 57 Wn.2d 624, 358 P.2d 958 (1961) as controlling. Both were decided over 50 years ago but neither has been narrowed or overruled. Applying the appropriate presumptions and burden of proof, the trial court's findings do not support its conclusion that the Gamboas' use was adverse for a continuous period of 10 years before litigation commenced. As a result, the Clarks were not time barred from relying on their title to recover full possession of their land. We reverse the trial court's award of a limited nonexclusive prescriptive easement in favor of the Gamboas, and its award of fees and costs.

FACTS AND PROCEDURAL BACKGROUND

The Gamboas and the Clarks have been rural or semirural neighbors in Sunnyside, Yakima County since 1995. The Gamboas own a 17-acre parcel on which they have a home and grow alfalfa. The Clarks own a 25-acre parcel to the east, on which they have a home and farm Concord grapes. The following depiction, modified from an exhibit,[1]

---

[1] The horizontal aspect has been increased relative to the vertical to better fit the page.

shows the two properties and the dirt and gravel roadway running northerly from East

Allen Road on the south that is the subject matter of their dispute:



As one can see, the roadway connects to East Allen Road on the Gamboas'

property but quickly trends eastward, from which point it is largely located on the Clarks'

property. Pictures and testimony describing the field south of the Gamboas' home and

garage, which is planted in alfalfa, establish that there is nothing that would prevent the

3

Gamboas from laying a road to their home through their own property, although it would require them to relocate irrigation equipment and reduce their farmable acreage.

The Gamboas moved to their property in 1992, with the Clarks moving to their property to the east in 1995. The parties had a friendly neighborly relationship for years. Neither disputed the other's use of the dirt and gravel roadway. It was only the Gamboas who used the roadway as a driveway; the Clarks had a different driveway to their home, located to the east. The roadway was essential to the Clarks' farming operations, though, and they regularly used it to farm their westernmost rows of grapes.

In 2008, a dispute arose over the Gamboas' dogs. Letters went back and forth between Mr. Clark and Mr. Gamboa about that and other matters. In a letter sent by Mr. Gamboa in late October 2008, he complained that the Clarks' irrigation spray and runoff caused water stains on his family's vehicles and ruts in the roadway, and demanded that the Clarks keep their irrigation water in their vineyard and off "my driveway." Ex. 24. In a response sent in early December, Mr. Clark took issue with Mr. Gamboa's characterization of the roadway as "my driveway" and urged him to survey the property. Claiming that he and his wife owned the roadway, he proposed that the parties survey the property and work out an equitable arrangement.

The parties eventually agreed to share the cost of a survey to locate the common corners of their properties; the results suggested that the roadway was predominantly on the Clarks' property. The Clarks' lawyer thereafter proposed a lease for the Gamboas'

4

use of two strips of the Clarks' land as a roadway, for a rental amount of $1 a day. The Gamboas retained their own lawyer, who responded that the Gamboas would not sign a lease for something they already had, expressing his opinion that the Gamboas' use would support a prescriptive easement. Mr. Clark notified the Gamboas that they were trespassing as of mid-July 2009 and this suit followed in September.

Following a two-day bench trial, the trial court concluded that the Gamboas had demonstrated a prescriptive easement. It based its conclusion on findings that the Gamboas had continuously used the roadway as a driveway and that the use had been open, notorious, and uninterrupted for a period of approximately 16 years before the parties' dispute arose in late 2008; that the Gamboas sincerely believed they owned the land on which the roadway was situated and never asked the Clarks for permission to use it (nor was permission given by the Clarks); that the Gamboas bladed the roadway during their 16-year period of use, including to remove snow in the wintertime,[2] and on one occasion applied gravel to it; and that while both families were aware of the others' use of the road, neither objected to the others' use until 2008. The court also found that the Gamboas began building a shop and garage building near the eastern edge of their

---

[2] One of the Gamboas' witnesses, an 86-year-old neighbor, cast doubt on the significance of any snow removal. When asked whether he had seen Mr. Gamboa plow snow from the road, his immediate response was, "We don't have snow in Sunnyside." Report of Proceedings at 103. He then qualified that assertion, allowing as how "we may get six inches once in a while," although he had never personally seen Mr. Gamboa plowing snow. *Id.*

5

property in 2001 whose doors could only be accessed by vehicles from the disputed roadway,[3] but because it found that construction began only eight years before the lawsuit, construction of the building was immaterial.

As for the Clarks, the court found that they used the roadway to farm their most westerly row of grapes, to spray for weeds in the grapes, and for other uses necessary due to ownership of the farm. It found that they maintained the roadway for farming purposes.

The trial court's findings and conclusions included its legal conclusion (expressed in the findings) that "[a] claimant's use is adverse unless the property owner can show that the use was permissive." Clerk's Papers (CP) at 216 (Finding of Fact 15). Based on that reasoning, it found that "Mr. Clark did not give the Gamboas[ ] express or implied permission to use the road, and therefore, the use of the road by the Gamboas[ ] was adverse." *Id.* Having concluded that the Gamboas demonstrated their right to a prescriptive easement, it entered judgment awarding the Gamboas a nonexclusive easement over the Clarks' roadway.

The Clarks appeal.

---

[3] The Clarks did not assign error to this finding, but did argue that the inaccessibility found is not because the roadway is the only possible access; rather, the alternative access would require that the Gamboas relocate irrigation lines so that vehicles could pass.

ANALYSIS

The Clarks assign error to five findings of fact and five conclusions of law. Their overarching argument is that the trial court misapplied the burden of proof and the presumptions that apply or are overcome where the owner of a road allows a neighbor, whose use does not interfere with the owner's own use, to make common use of its road. Should we reverse the trial court on the easement issue, the Clarks ask that we also reverse the trial court's denial of their request for attorney fees and costs incurred in defending what they characterize as a nuisance claim by the Gamboas.

I.  Assignment of error to the trial court's findings and conclusions supporting and establishing a prescriptive easement.

*A. Did the Clarks waive any objection to the trial court's findings and conclusions?*

The Gamboas raise a threshold argument that the Clarks may not assign error to the trial court's findings or conclusions because the Clarks participated in presenting draft findings and conclusions and the trial court substantially relied on the Clarks' submissions. This was after the trial court announced its decision orally and then directed the lawyers that "[c]ounsel need . . . to prepare findings and conclusions," that "we can work out the details of the findings and conclusions," and "I encourage the parties to work together as they have . . . done so far." Report of Proceedings at 287.

Under CR 46, formal exceptions to a trial court's findings are unnecessary; "it is sufficient that a party, at the time the ruling or order of the court is made or sought,

7

makes known to the court the action which he desires the court to take or his objection to the action of the court and his grounds therefor." The Gamboas rely solely on the Clarks' failure to formally object to findings and conclusions in the trial court; they make no effort to show that the court was unaware of, or was misled as to the Clarks' position on the facts and law.

The Clarks have taken no position on appeal that they did not clearly communicate to the court through the briefing, argument, and evidence they presented during the bench trial. A party who clearly presents its factual and legal position at trial, but loses, does not waive error by cooperating when a trial court asks that its lawyer provide draft findings and conclusions that reflect the court's announced decision.

### B. Do the trial court's findings of fact support its conclusion that the Gamboas have satisfied all the elements entitling them to a prescriptive easement?

Whether a party has established the elements of a prescriptive easement is reviewed as a mixed question of fact and law. *Lee v. Lozier*, 88 Wn. App. 176, 181, 945 P.2d 214 (1997). We will uphold factual findings supported by the record. *Id.* We "must defer to the trier of fact on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence." *State v. Thomas*, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004) (citing *State v. Cord*, 103 Wn.2d 361, 367, 693 P.2d 81 (1985)). We review de novo whether the trial court's conclusions of law are properly derived from the

8

findings of fact. *State v. Pierce*, 169 Wn. App. 533, 544, 280 P.3d 1158, *review denied*, 175 Wn.2d 1025 (2012).

In its seminal decision in *Northwest Cities Gas Co. v. Western Fuel Co.*, 13 Wn.2d 75, 82, 123 P.2d 771 (1942), our Supreme Court began its review of a prescriptive easement case with a statement of 16 principles that had been definitely established in Washington or should be adopted. Among them was that "[w]hen one enters into the possession of another's property there is a presumption that he does so with the true owner's permission and in subordination to the latter's title." *Id.* at 84. Others are that "[t]he burden of proving a prescriptive right rests upon the one who is to be benefited by the establishment of such right," who "must prove that his use of the other's land has been open, notorious, continuous, uninterrupted, over a uniform route, adverse to the owner of the land sought to be subjected, and with the knowledge of such owner at a time when he was able in law to assert and enforce his rights." *Id.* at 84-85.

Other principles stated in *Northwest Cities* recognize that the initial presumption of permissive use can shift. Generally, "proof that the use by one of another's land has been open, notorious, continuous, uninterrupted, and for the required time, creates a *presumption* that the use was *adverse*, unless otherwise explained, and, in that situation, in order to prevent another's acquisition of an easement by prescription, the burden is upon the owner of the servient estate to rebut the presumption by showing that the use was permissive." *Id.* at 85. We refer to this principle frequently hereafter, and for ease

9

of reference will not recite all of the elements that must be proved before this shift

occurs, but will instead simply refer to the "shift in the presumption from permissive to

adverse use." The majority of American states apply this presumption that an

unexplained use continued for the prescriptive period is adverse. RESTATEMENT (THIRD)

OF PROPERTY: SERVITUDES § 2.16 cmt. g (2000).

*Northwest Cities* recognized that this shift in the presumption from permissive to

adverse use will not occur in the case of "vacant, open, uninclosed, unimproved lands."

13 Wn.2d at 86. The rationale for this exception suggested by *Watson v. County

Commissioners of Adams County*—authority relied upon by *Northwest Cities*—is that

land that is vacant and unoccupied "'remains free to public use and travel until

circumstances induce the owners to enclose it,'" such that travel over it by others, "'even

after the period of twenty years, is regarded merely as a permissive use.'" 38 Wash. 662,

664, 80 P. 201 (1905) (quoting *O'Connell v. Chi. Terminal Transfer R.R. Co.*, 184 Ill.

308, 315-16, 56 N.E. 355 (1900)).

While *Northwest Cities* states that the shift in the presumption from permissive to

adverse use "does not apply" to vacant, unenclosed lands, the *Restatement* characterizes

the exceptional treatment for such property somewhat differently: as "overcom[ing] the

presumption of prescriptive use" or "creating a counter-presumption" that use was

permissive. RESTATEMENT § 2.16 cmt. g. We prefer to conceptualize the exceptional

circumstance of vacant, unenclosed lands (and others, discussed hereafter) as preventing

10

a shift to a presumption of adverse use from occurring—both because it is consistent with the language of Washington decisions and to avoid the quagmire of competing theories of presumptions that is surveyed by the dissent.

In its 1946 decision in *Roediger*, 26 Wn.2d 690, the Washington Supreme Court surveyed Washington case law and that of other jurisdictions to decide whether and when a property owner's acquiescence or sufferance of a neighbor's arguable trespass supports a reasonable inference of "neighborly accommodation" that should, like the vacant, unenclosed character of land, prevent a shift from a presumption of permissive use to a presumption of adverse use.

*Roediger* involved prescriptive rights to a beachfront path on Vashon Island. The path ran westerly through 17 residential beachfront lots and then through 2 other residential parcels, where it continued along a county road to a dock from which ferries operated to the mainland. A number of path users brought suit to establish their prescriptive right to use the path after the owners of 1 parcel posted a notice that the pathway through their property would be closed, then destroyed the pathway as constructed, and finally began construction that would extend into and block the pathway.

Every path user called as a witness testified that he or she never asked or received permission of the servient owners to cross their property. And it was stipulated by the servient owners that other witnesses, if called, would testify similarly. Relying on this evidence, the path users claimed that their use of the path without express permission was

11

necessarily adverse. The Supreme Court characterized this contention as the one on whose answer its decision "will largely, though not wholly, turn." *Id.* at 698.[4]

The court rejected the path users' contention that since they had no express permission to cross the servient owners' property it necessarily followed that the use was adverse, a contention the court said "completely disregards the well-established rule that permissive use may be implied." *Id.* at 707. While the court conceded that the implication of permissive use has been "chiefly applied in cases involving uninclosed lands," it held the implication of permissive use "applicable to *any situation where it is reasonable to infer that the use was permitted by neighborly sufferance or acquiescence.*" *Id.* (emphasis added).

The court then turned to cases from other jurisdictions illustrating situations where it is reasonable to infer neighborly sufferance or accommodation. It quoted a California case for the proposition that it would be "'a blot upon the law'" if an owner who allowed a neighbor to use a trail by silent permission, "'nothing being said as to any right being claimed,'" could thereby have an adverse title successfully set up against him. *Id.* at 708

---

[4] Because one owner of a servient property had acquired title from the federal government within the period of the statute of limitations, the trial court eventually decided the case on a public easement basis. The Supreme Court found this reasoning to be flawed. 26 Wn.2d at 705. The case had been pleaded as a private easement case and could be pursued against most of the owners of servient properties on that basis, and it was that basis on which the Supreme Court proceeded to analyze the evidence. The court also noted that nine key propositions relied upon from *Northwest Cities* applied whether the easement was public or private. *Id.* at 706-07.

12

(quoting *Clarke v. Clarke*, 133 Cal. 667, 670, 66 P. 10 (1901)). It cited a Nevada case holding that a use acquired by "'consent, permission, *or indulgence* of the owner of the servient estate'" can never ripen into a prescriptive right unless the user expressly denies that his use is by license or permission "'and openly declares his right to be adverse to the owner of the servient estate.'" *Id.* at 709 (emphasis added) (quoting *Howard v. Wright*, 38 Nev. 25, 143 P. 1184, 1186 (1914) (citing *Hurt v. Adams*, 86 Mo. App. 73 (1900))).

It quoted a North Carolina case at some length, adding its own emphasis:

> "The law should, and does encourage acts of neighborly courtesy; a landowner *who quietly acquiesces* in the use of a path, or road, across his uncultivated land, resulting in no injury to him, but in great convenience to his neighbor, ought not to be held to have thereby lost his rights. It is only when the use of the path or road is clearly adverse to the owner of the land, and not an enjoyment of neighborly courtesy, that the land owner is called upon 'to go to law' to protect his rights."

*Id.* (quoting *Weaver v. Pitts*, 191 N.C. 747, 133 S.E. 2, 3 (1926)). The court found all of this authority consistent with its statement a year earlier in *State ex rel. Shorett v. Blue Ridge Club, Inc.*, 22 Wn.2d 487, 495-96, 156 P.2d 667 (1945) that "[a]n owner is not required to adopt a dog-in-the-manger attitude in order to protect his title to his property," and that the law pertaining to a "presumed grant" should not be extended to subject an owner to an adverse title "through mere neighborly courtesy by a land owner."

Importantly, while the court discussed how the vacant, unenclosed character of land prevents a shift of presumption from permissive to adverse use and its suspicion that

13

the beachfront properties at issue in the case were unenclosed, it did "not decide the case on that theory." 26 Wn.2d at 711. It relied instead on what was then the "modern" trend to recognize neighborly courtesy as itself preventing a shift in the presumption. It cited *Thompson on Real Property* for the proposition that

> "[t]he modern tendency is to restrict the right of one to acquire a prescriptive right of way whereby another, through a mere neighborly act, may be deprived of his property by its becoming vested in the one whom he favored. Thus, where persons traveled the private road of a neighbor in conjunction with such neighbor and other persons, nothing further appearing, *the law presumes such use was permissive, and the burden is on the party asserting a prescriptive right to show that his use was under claim of right and adverse to the owner of the land.*"

*Id.* (emphasis added) (quoting 2 GEORGE W. THOMPSON, COMMENTARIES ON THE MODERN LAW OF REAL PROPERTY § 521, at 106 (Perm. ed. 1939)). The court relied on the following language from *Jones on Easements*, repeated in *Thompson on Real Property*, which the court described as oft-cited—including in its own decision in *Scheller v. Pierce County*:

> If the use of a way over one's land be shown to be permissive only, no right to use it is conferred, though the use may have continued for a century, or any length of time. "A different doctrine would have a tendency to destroy all neighborhood accommodation in the way of travel; for if it were once understood that a man, by allowing his neighbor to pass through his farm without objection over the pass-way which he used himself, would thereby, after the lapse of twenty or thirty years, confer a right on him to require the pass-way to be kept open for his benefit and enjoyment, a prohibition against all such travel would immediately ensue.

14

LEONARD A. JONES, A TREATISE ON THE LAW OF EASEMENTS § 282, at 232-33 (1898)

(boldface and footnote omitted) (quoting *Hall v. McLeod*, 59 Ky. (2 Met.) 98, 101, 74

Am. Dec. 400 (1859)), *cited in Roediger*, 26 Wn.2d at 711, 712; *Scheller v. Pierce

County*, 55 Wash. 298, 301, 104 P. 277 (1909).

Yet another circumstance that will prevent or overcome a shift to a presumption of

adverse use is where the property at issue is a road, constructed by the servient owner or

his predecessors in interest for their own use, which the party claiming a prescriptive

right uses in common. In *Cuillier*, 57 Wn.2d 624, the owner of a servient estate brought

suit to enjoin a neighbor from using an orchard road along a portion of the south line of

the servient owner's property. In analyzing the claim of a prescriptive right, the court

assumed that the defendants and their predecessors had used the road for the required

period of time without ever asking for or receiving permission.

Citing *Roediger*, *Shorett*, and *City of Spokane v. Catholic Bishop of Spokane*, 33

Wn.2d 496, 206 P.2d 277 (1949), the court in *Cuillier* held that evidence that a claimant

has used a road on another's property that the property owner continues to use for its own

purposes, "signifies only that the owner is permitting his neighbor to use the road in a

neighborly way." 57 Wn.2d at 627. The rule, it held, is as follows:

> "Where the way in question is shown to have been opened or
> maintained by the owner of the soil for his own benefit, and the claimant's
> use of it appears to have been merely in common with him, *no presumption
> arises that the latter's use of it was adverse or under a claim of right.* In
> the absence of additional circumstances pertaining to the origin or nature of

15

the claimant's use, and expressing a purpose to impose a separate servitude upon the land, *the use is presumed to be permissive only.*"

*Id.* (emphasis added) (quoting J.E. Macy, Annotation, *Easement by Prescription: Presumption and Burden of Proof as to Adverse Character of Use*, 170 A.L.R. 776, 825 (1947)).

These Washington cases holding that several fact situations prevent any shift of the presumption from permissive to adverse use are consistent with the majority rule as summarized in the *Restatement*, even though the *Restatement* refers to the presumption of adverseness as the presumption of "prescriptive use," and of the several fact situations that "overcome" or "counter" it. Section 2.16 comment g of the *Restatement* states:

> In states following the majority rule, particular fact situations overcome the presumption of prescriptive use, creating a counter-presumption that the initial use was permissive. Evidence that the claimed servient estate was wild, unenclosed, vacant land overcomes the presumption of prescriptive use in many states, creating a presumption that the use was permissive. Evidence that the use was made in common with the owner of the land, or that the road over which a right of way is claimed was constructed by the owner for his own use, may also overcome the presumption of prescriptive use. Other evidence that will overcome the presumption is that the initial users were closely related, or enjoyed close neighborly relations, or that a custom existed in the neighborhood for neighborly accommodation by permitting use of neighboring land for access to fields and public roads.

In response to the foregoing authority, the Gamboas place substantial reliance on the decision of Division One of this court in *Drake v. Smersh*, 122 Wn. App. 147, 89 P.3d 726 (2004). That decision suggested a distinction between vacant land cases, in which it

recognized that a servient owner is entitled to a presumption of permissive use, and developed land cases, in which, "when the facts in a case support an inference that use was permitted by neighborly sufferance or accommodation, a court may *imply* that use was permissive and accordingly conclude the claimant has not established the adverse element of prescriptive easements." *Id.* at 154. As the Gamboas construe *Drake*, where evidence supports a reasonable inference of neighborly accommodation it will not prevent a shift in the presumption from permissive to adverse use. As understood by the Gamboas, the presumption will still shift to one of adverse use, the burden will then be upon the owner of the servient estate to rebut the presumption by showing that the use was permissive, and any evidence of neighborly accommodation offered by the owner is only evidence that may, but need not, be found persuasive by the trier of fact.

This reading is understandable in light of some of the statements made in *Drake*, which the dissent understandably highlights. But we are unable to reconcile those statements with *Roediger*, which is controlling, and equally importantly we cannot reconcile those statements with the nature of review then undertaken in *Drake*. As presented on appeal, Drake, the claimant, had proved all elements of a prescriptive easement except adverse use. Smersh, the servient owner, conceded this. The only issue on appeal was whether Smersh could persuade the court that the use was conclusively permissive. Under the Gamboas' reading of the case, this would trigger substantial evidence review. It would not matter if Smersh had presented *some* evidence from which

17

the trial court could infer neighborly accommodation, because the trial court was not required to draw that inference. In short, the only way that Smersh could prevail on appeal under the Gamboas' reading would be by demonstrating that he had presented the trial court with evidence of permissive use so overwhelming that, *as a matter of law*, it rebutted the presumption of adverse use.

Yet that is not how the court analyzed the case on appeal. It did not examine whether Smersh had compellingly rebutted a presumption, it examined whether Smersh had presented *any evidence* supporting an inference of neighborly accommodation—suggesting that if he had, he would be entitled to an "implication" that Drake's use was permissive.[5] It found literally no evidence that would support neighborly

---

[5] The *Drake* court spoke of an *implication* of permissive use in neighborly accommodation cases and a *presumption* of permissive use in vacant land cases. *Roediger* made no such distinction. Where vacant land was involved, it sometimes spoke of an *implication*. 26 Wn.2d at 707 (speaking of the rule "chiefly applied in cases involving uninclosed lands"), 709 (discussing *Shorett*, a vacant land case). Where neighborly accommodation was at issue, it sometimes spoke of a *presumption*. *Id.* at 707-08 (quoting *Clarke*), 711 (quoting *Thompson on Real Property*). Read as a whole, *Roediger* used the terms interchangeably. We prefer to speak of *presumptions* because of the confusion that can arise from different uses of the word *imply*. As Bryan A. Garner discusses and demonstrates in his *Dictionary of Modern Legal Usage* 423 (2d ed. 1995), Anglo-American judges often use *imply* in a specialized sense, as meaning "'(of a court) to impute or impose on equitable or legal grounds,'" offering, as an example, that "[a]n *implied* contract is not always one implied from the facts of the case, but may be one implied by the court, i.e., imposed by the judge or judges as a result of their inferences." He suggests that this special legal sense can often be identified when one can read *impute* in place of *imply* and have the same meaning. *Id.* at 424. We read *Roediger* as using *imply* in this sense. By contrast, lawyers and judges sometimes use *imply* in a different sense, according to Garner, as meaning *infer*, in the sense of *implying* one fact from

18

accommodation, however, including no neighborly relationship. It affirmed the trial

court because "we cannot draw a reasonable inference of permissive use from the facts in

the case." *Id.* at 155. Such an inability would not matter if evidence of neighborly

accommodation has no special significance and the appellate court was engaged in

substantial evidence review. The fact that the court could not draw a reasonable

inference of neighborly accommodation mattered because if it could, it would have

ramifications for the applicable presumptions and burden of proof.[6]

We have several other reasons for rejecting the Gamboas' reading of *Drake* as

holding that evidence of neighborly accommodation (unlike the vacant, unenclosed

character of land) will not prevent a shift to a presumption of adverse use. First,

---

others. *See id.* Used in that sense, an inference from evidence suggesting neighborly
accommodation might be misunderstood (as the Gamboas understand it) as being no
more important than inferences from any evidence, which a trier of fact may, but need
not, draw.

[6] Division One applies *Drake* consistent with our understanding. *See Whyte v.
Jack*, noted at 176 Wn. App. 1015, 2013 WL 4736380 (holding that the facts supported
the inference of permissive use and from that, analyzing whether the party claiming the
benefit of the easement presented sufficient evidence to meet its burden of demonstrating
adverse use); *Kerby v. Auttelet*, noted at 152 Wn. App. 1064, 2009 WL 3723803, at *2
("The inference of permissive use applies when a court can reasonably infer that the use
was permitted by neighborly sufferance or acquiescence" (citing *Kunkel v. Fisher*, 106
Wn. App. 599, 602, 23 P.3d 1128 (2001))). Consistent with GR 14.1(a), which prohibits
parties from citing an unpublished opinion of the Court of Appeals *as an authority*, we
cite to the unpublished opinions not as precedent but instead to show that, in practice,
Division One has applied *Drake* to prevent a shift to a presumption of adverse use if
evidence supports an inference of neighborly accommodation. *Cf. State v. Arreola*, 176
Wn.2d 284, 297 n.1, 290 P.3d 983 (2012).

19

*Roediger* did not treat vacant land cases as uniquely entitled to a presumption of permissive use. It observed that the rule that permissive use may be implied "has been *chiefly applied* in cases involving uninclosed lands, but is *applicable to any situation where it is reasonable to infer that the use was permitted by neighborly sufferance or acquiescence.*" 26 Wn.2d at 707 (emphasis added). It speaks of a "presumption" of permissive use in citing *Clarke*, 133 Cal. at 670 ("[t]he law will presume that the land belongs to the owner . . . and that the use was by permission"); and in citing 2 THOMPSON, *supra*, § 521, at 106 (stating that where use is made of a neighbor's road, nothing further appearing, "the law presumes such use was permissive"). 26 Wn.2d at 708, 711.

Second, while a handful of Washington cases citing *Drake* have referred to a "vacant lands doctrine," cases from other jurisdictions have not referred to any such doctrine and other authorities have not referred to such a doctrine or applied unique treatment to vacant land. *See, e.g*, RESTATEMENT § 2.16 reporter's note at 248-52 (collecting cases in four categories as "evidence that overcomes general presumption of nonpermissive use," one being "wild, vacant and unenclosed land" and the others being a facility (generally a road) built and used by owner; a close relationship between claimant and landowner; and local custom of neighborly accommodation (formatting omitted)); JON W. BRUCE & JAMES W. ELY, JR., THE LAW OF EASEMENTS AND LICENSES IN LAND §§ 5:3, 5:9 & n.8 (2013) (recognizing that presumption of adverse use does not apply to

20

vacant and unenclosed land, to use when there is a family relationship, or, in some jurisdictions, to use of an existing road in a manner that does not interfere with usage by the landowner).

Third, from the time that *Northwest Cities* itemized the principles that had been "definitely established" by Washington prescriptive easement cases, the principle that the initial presumption of permissive use can shift to a presumption of adverse use has always been subject to a qualifier: unobjected-to use will shift the presumption "unless otherwise explained." 13 Wn.2d at 85. No Washington decision has ever examined the scope of unobjected-to use that is "otherwise explained" and therefore immune from the shifting presumption. But the qualifier is reasonably read as contemplating exceptions like the exception for vacant land that was relevant in *Northwest Cities*. The general nature of the qualifier also contemplated that there might be other explanations sufficient to prevent a shift in the presumption. *Roediger* and *Cuillier* are both cases in which the Supreme Court identified "other explanations" of unobjected-to use that are sufficient to prevent a shift to a presumption of adverse use.

This is our principal response to the dissent. The dissent, picking up the use of the term "counter-presumption" by, e.g., the *Restatement*, embarks on a scholarly exposition of presumptions and concludes that *Roediger* cannot be understood to have created a "counter-presumption." While we appreciate the support that the *Restatement* provides for our position, we are not wedded to what the dissent argues is an inapt label of a

21

"counter-presumption." The Washington cases never use that term. *Roediger* and

*Cuillier* are reasonably read to treat neighborly accommodation exactly the same way

*Northwest Cities* treats the vacant, unenclosed character of land: as preventing a

presumption of adverse use from ever arising, thereby leaving the initial presumption of

permissive use in place.[7] Again, *Roediger* and *Cuillier* are simply cases in which the

Supreme Court identified "other explanations" of unobjected-to use that are sufficient to

prevent a shift in the presumption from permissive to adverse use.

---

[7] A nuanced understanding of theories of presumptions is helpful in general, but not in applying the controlling Washington case law. Even the dissent acknowledges, after differentiating Thayer and Morgan theories of presumption, that Washington fails consistently to follow either. (For the Thayer and Morgan theories see JAMES B. THAYER, PRELIMINARY TREATISE ON EVIDENCE 346 (1898) and Edmund M. Morgan, *Instructing the Jury upon Presumptions and Burden of Proof*, 47 HARV. L. REV. 59 (1933).)

Dean Orland put it even more bluntly in a 1978 law review article, recounting the history of a proposed (never adopted) Washington evidence rule on presumptions, during which the staff of the Judicial Council was asked to study Washington law and the effect that the proposed rule would have on it. The result, he explains, was that

after demonstrating that much of the Washington presumption law was in such a state of anarchy that the current law could not be identified (making the enterprise one in which the issue was how a rule could affect a chimera), the reporter's discussion concluded that some Washington presumption law or, perhaps more accurately, some Washington presumption opinions, would be affected by the rule.

Lewis H. Orland, *Presumptions: Reflections on Washington's Proposed Rule 301*, 13 GONZ. L. REV. 935, 945 n.54 (1978). Delving into competing theories of presumptions is also unnecessary. We agree with the dissent about how the presumption of adverse use operates once it arises. We disagree only about whether it *does* arise when a servient owner's evidence supports an inference of neighborly accommodation.

In concluding that only vacant, unenclosed land will prevent a shift in the presumption, the dissent appears to rely on the fact that *Northwest Cities* only cites vacant, unenclosed land as preventing the shift. But there was no need to discuss neighborly accommodation in *Northwest Cities*; neighborly accommodation was never raised by the parties or even suggested by the facts.[8] The dissent also discounts the importance that we attach to the "unless otherwise explained" qualifier, characterizing it as meaning no more than that adverse possession, once presumed, can be disproved. But consider the structure of critical language: "proof of [A] creates a presumption [B], unless [C]." "Creates a presumption . . . unless" is telling us something about what can prevent the presumption from being created, not what overcomes it once it is created. This is even more clear from the remainder of the same sentence, which discusses how the presumption is overcome ("in that situation, in order to prevent another's acquisition of an easement by prescription, the burden is upon the owner of the servient estate to rebut the presumption by showing that the use was permissive," 13 Wn.2d at 85). If "unless

---

[8] *Northwest Cities* involved the unilateral construction by Pacific Power & Light of a roadway through an industrial property in Yakima—property owned by a woman who lived 40 miles away, in Ellensburg. The company did not ask the owner's permission to build the road and there was no evidence that she even "had any *actual* knowledge whatever" that the company had entered her land. 13 Wn.2d at 90. According to the court, the company's acts were of "such a nature as to indicate a hostile intent." *Id.*

otherwise explained" means "unless disproved," then *Northwest Cities* says the same

thing, twice, in the same sentence.[9]

Finally, if we do not recognize that a reasonable inference of neighborly

accommodation overcomes the presumption of adverse use, then we have not extended

any meaningful protection to the silently acquiescent neighbor whose rights and interests

concerned the court in *Roediger*. Where a silently acquiescent owner tolerates use by a

claimant who engages in no overt hostile act, the presumption that applies is critical. If all

it takes for the claimant to enjoy a presumption of adverse use is to show that his good

---

[9] A couple of points are in order with respect to the dissent's discussion of
*Cuillier*. The dissent concludes, wrongly, that *Cuillier*'s placing the decision in the hands
of the trier of fact is evidence that *Roediger* created an inference rather than a
presumption. Where there is disputed evidence on the issue of adverse versus permissive
use, as there was in *Cuillier*, the decision will always be one for the trier of fact. Under
our analysis, a servient owner who presents evidence from which to infer neighborly
accommodation prevents a presumption of adverse use from arising and preserves the
initial presumption of permissive use. But the presumption of permissive use is still a
rebuttable presumption, not a conclusive one.

We also note that *Cuillier* describes the counter-presumption of adverseness (what
the dissent characterizes as "[t]he only real presumption in prescriptive easement cases,"
*see* Dissent at 3) as only an inference. After conceding that *Northwest Cities* and other
cases state that use for the prescriptive period gives rise to a presumption of adverse use,
*Cuillier* says:

> We think, however, a more accurate statement, based on the results
> and holdings in all of our cases, would be that such unchallenged use for
> the prescriptive period *is a circumstance from which an inference may be
> drawn that the use was adverse.* Such unchallenged use is but one
> circumstance.

57 Wn.2d at 627 (emphasis added). We submit that *Northwest Cities* had this point right
and *Cuillier* gets it wrong. It does point up the importance of looking at the body of case
law as a whole.

neighbor allowed him to use property openly, notoriously, and without interruption for the required period of time (something a good neighbor might do) how can the silently acquiescent good neighbor overcome the presumption? Washington cases have held that an owner's subjective belief that his property was being used with his permission does not count as evidence of permission. *See Harris v. Urell*, 133 Wn. App. 130, 140, 135 P.3d 530 (2006) (citing *Chaplin v. Sanders*, 100 Wn.2d 853, 860-61, 676 P.2d 431 (1984)). If evidence supporting an inference of neighborly accommodation does not prevent the presumption from shifting, then silently acquiescent neighbors will often lose. Such an outcome is impossible to reconcile with *Roediger*, *Cuillier*, and the well-settled principle that prescriptive rights are not favored in the law. *Northwest Cities*, 13 Wn.2d at 83.

We therefore apply what we believe to be the principles established by *Roediger* and *Cuillier*. Evidence that supports a reasonable inference of neighborly accommodation or that demonstrates no more than a claimant's noninterfering use in common of a road constructed by his neighbor (or the neighbor's predecessor) will prevent a shift from the initial presumption of permissive to adverse use. This does not mean that the property owner necessarily prevails. *Northwest Cities* makes clear that notwithstanding a presumption of permissive use, a claimant may still establish a prescriptive right "when the facts and circumstances are such as to show that the user was adverse and hostile to the rights of the owner, or that the owner has indicated by some act his admission that the claimant has a right of easement." *Id.* at 87. A use is adverse

25

when the claimant "uses the property as the true owner would, under a claim of right, disregarding the claims of others, and asking no permission for such use." *Kunkel v. Fisher*, 106 Wn. App. 599, 602, 23 P.3d 1128 (2001).

When we apply the proper presumption and burden of this proof, we agree with the Clarks that the trial court's legal conclusions are not supported by its findings and that a key finding is not supported by the evidence.

Among the conclusions of law challenged by the Clarks are conclusions implicitly or explicitly concluding that the Gamboas' use of the gravel roadway was adverse for at least 10 years before commencement of the parties' lawsuit in 2009. The Clarks also challenge the court's finding 15, which is a conclusion of law insofar as it states that "[a] claimant's use is adverse unless the property owner can show that the use was permissive." CP at 216. If a conclusion of law is labeled as a finding of fact, it will still be considered a conclusion of law and subject to de novo review. *Keever & Assocs., Inc. v. Randall*, 129 Wn. App. 733, 738, 119 P.3d 926 (2005).

The court's findings reveal the reasoning by which the trial court found adverse use: that "Mr. Clark did not give the Gamboas[ ] express or implied permission to use the road, and therefore, the use of the road by the Gamboas[ ] was adverse." CP at 216 (Finding of Fact 15). The court's finding that *express* permission was not given does not support a legal conclusion of adverse use under well-settled Washington case law. *See McMilian v. King County*, 161 Wn. App. 581, 601, 255 P.3d 739 (2011) (collecting cases

26

holding that permission need not be express, but can be implied). Its finding that Mr. Clark did not give the Gamboas *implied* permission to use the road is not supported by substantial evidence; instead, the evidence and the trial court's other findings support a presumption of permissive use that the Gamboas failed to overcome.

The court found that the parties are neighbors, that both used the roadway without any disputes until 2008, and that each was aware of the other's use of the roadway but neither objected to the other's use until a dispute arose in 2008. It found that the roadway existed on a parent parcel from which the Clarks derived their title; it was not built by the Gamboas. It found that the Clarks continued to use the roadway themselves to farm, to maintain the road for farming purposes, and for all other uses made necessary due to ownership of the farm. Although it found that the Gamboas performed some maintenance, it did not find that they improved the roadway. Evidence that the Gamboas occasionally bladed the road, plowed snow, and on one occasion applied gravel, is only evidence of maintenance facilitating the particular use (year-round use as a driveway) that the Clarks allowed the Gamboas to make of the roadway. *Cf. Woods v. Hart*, 254 Or. 434, 458 P.2d 945 (1969) (it is more reasonable to assume that a noninterfering use of a neighbor's road is pursuant to a friendly arrangement than to assume the user was making an adverse claim; even sharing in the work and expense of maintaining the road is equally inferable as compensating servient owners for the privilege of using the way).

27

The court's findings support an inference of neighborly accommodation. They also demonstrate noninterfering use, in common, of a roadway that was constructed by the Clarks' predecessor and that the Gamboas did not improve. The Clarks were entitled to a presumption of permissive use under both *Roediger* and *Cuillier*.

There are no findings that overcome the presumption of permissive use. The court found that the Gamboas used the roadway in good faith, in the sincere belief that they owned it. But this finding, while supported by the evidence, is irrelevant. *See Chaplin*, 100 Wn.2d at 860 ("the claimant's motive in possessing the land is irrelevant and no inquiry should be made into his guilt or innocence").

II. Does reversal of the trial court require an award of attorney fees
to the Clarks under RCW 7.48.315?

In response to the Gamboas' suit, the Clarks asserted counterclaims and prayed for an award of attorney fees and costs. In their trial brief, they cited RCW 7.48.315, which they characterized as a "right to farm" law, as a basis for a fee award. CP at 103. RCW 7.48.315 provides that farmers who successfully defend against a claim that their agricultural activity constitutes a nuisance or is in violation of "specified laws, rules, or ordinances" may recover expenses and costs.

The trial court concluded that "[s]ince the Gamboas prevailed on their claim for a prescriptive easement . . . there is no basis to award the Clarks prevailing party attorney's fees or costs under RCW Chapter 7.48." CP at 218 (Conclusion of Law 7). If we reverse

28

the trial court's award of a prescriptive easement, the Clarks ask that we award them damages, fees, and costs incurred in the trial court or remand for consideration of that request by the trial court.

The Gamboas did not assert a claim that entitles the Clarks to damages, fees, or costs under RCW 7.48.315. While the amended complaint referred to an alleged overspraying by the Clarks of irrigation water, it was not as the basis for a nuisance claim or a claim that the Clarks' irrigation was in violation of any "specified law, rule, or ordinance." Rather, the Gamboas requested an injunction to restrain the Clarks from blocking access to the roadway. In that connection, they alleged that the Clarks had been towing vehicles parked on the roadway, oversprayed irrigation water, and threatened to install another row of grapes that would eliminate one-half of the roadway. Their request for relief was predicated on their position that the conduct interfered with their easement rights, not that it constituted a nuisance or violated the law.

We may sustain the trial court result on any correct ground, even though that ground was not considered by the trial court. *J-U-B Eng'rs, Inc. v. Routsen*, 69 Wn. App. 148, 150, 848 P.2d 733 (1993). Damages, fees, and costs under chapter 7.48 RCW were properly denied.

### III. Attorney fees and costs on appeal.

The Clarks request an award of attorney fees on appeal under RAP 18.1 and RCW 7.48.315 and an award of costs under RAP 14.2.

29

Attorney fees may be awarded at the appellate level only when authorized by contract, a statute, or a recognized ground of equity. RAP 18.1; *Labriola v. Pollard Grp., Inc.*, 152 Wn.2d 828, 839, 100 P.3d 791 (2004). The Clarks rely on RCW 7.48.315, which we have determined does not apply. Their request for fees is denied.

As the prevailing party on appeal, the Clarks are entitled to costs on appeal under RAP 14.2 upon compliance with RAP 14.4.

We reverse the trial court's award of a limited nonexclusive prescriptive easement in favor of the Gamboas and its money judgment for their statutory attorney fees and costs.[10] We affirm its judgment and decree that the express easement recorded February 14, 1964 as Auditor's File No. 1984788 remains valid.

_____
Siddoway, J.

I CONCUR:

_____
Moreno, J.P.T.

---

[10] At oral argument, the lawyer for the Gamboas conceded that their prescriptive easement claim was the only claim submitted for decision by the trial court. Although they had pleaded two other claims for relief in their complaint, they abandoned those theories at the close of the evidence.

No. 30826-0-III

KORSMO, C.J. (dissenting) — The trial court acted within its fact finding authority when it determined that the Gamboas had established a prescriptive easement. Therefore, I respectfully dissent because I believe the majority misapplies the concepts of presumptions and inferences, which in turn leads it to not give due deference to the trier of fact. Because I agree with much of the majority's scholarly foundational analysis, I will start by noting our agreements before coming to our disagreements.

I agree with the majority's characterization of *Northwest Cities Gas Co. v. Western Fuel Co.*, 13 Wn.2d 75, 123 P.2d 771 (1942), as the seminal case on prescriptive easements in Washington. I also agree that analysis of this issue cannot rest solely on *Northwest Cities*, but must also take into consideration the subsequent developments made in *Roediger v. Cullen*, 26 Wn.2d 690, 175 P.2d 669 (1946), and *Cuillier v. Coffin*, 57 Wn.2d 624, 358 P.2d 958 (1961). Based on these cases, I agree that there exists a so-called "presumption" of permissive use, also referred to as neighborly accommodation, and that it weighs against the element of adverseness. I also agree that this so-called presumption can be rebutted by evidence to support all other elements of a claim of prescriptive easement, and that when these elements are shown a true presumption of

adverseness arises. Although this is not a case of open unimproved land, I also agree that the presumption of adverseness does not arise in cases of open unimproved lands.

However, I disagree with the majority's assertion that *Roediger* and *Cuillier* created a class of cases involving occupied, enclosed, or improved land where the presumption of adverseness can be ignored altogether. I also disagree with the *Restatement*'s view that *Roediger* and *Cuillier* created a "counter-presumption" to the "counter-presumption" in cases where the land is occupied, enclosed, or improved. Rather, these cases allowed for a reasonable inference. For that reason, I disagree with the majority's conclusion that the presence of findings sufficient to support an inference of neighborly accommodation entitled the Clarks to a presumption of permissive use. The trial court was not required to find accommodation just because it was permissible to do so.

Before wading into this esoteric area of law, a few words of warning authored by Justice Hale a half century ago should be recalled:

> [This case] compels us to take a look at the whole field of presumptions—an area we enter now albeit with reluctance. We hesitate to go into the legal area where presumptions abound, for it is a place fraught with danger—in some areas an almost impenetrable jungle, in others a mist-laden morass—where more than one academician has been known to lose his way and, once returned, is never quite the same again.
> For presumptions—natural in origin though they may be—having their roots in and drawing their sustenance from the common experiences of mankind, have suffered the artificial but inexorable labeling and classifying processes of the law. There are conclusive presumptions and rebuttable presumptions and presumptions of law and also of fact, and

2

mixed presumptions of either. And then there are dry presumptions (Aren't they all?) but no wet ones, and both natural and artificial presumptions; and then there are pseudo presumptions and violent presumptions, and, of course, there are presumptions which are not really presumptions at all, but mere inferences. Then there are presumptions which are real presumptions, and others which are held to be evidence.

*Burrier v. Mutual Life Ins. Co. of N.Y.*, 63 Wn.2d 266, 274, 387 P.2d 58 (1963).

In *Northwest Cities*, the Washington Supreme Court said, "When one enters into the possession of another's property there is a presumption that he does so with the true owner's permission and in subordination to the latter's title." *Northwest Cities*, 13 Wn.2d at 84. I referred to this presumption as "so-called" because it is not a presumption in the true sense of the word; rather, it is an *assumption*. While most lawsuits begin on a blank slate, some do not. In the law, assumptions are used as starting points in cases and dictate who carries the burden of proof. 5 KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE LAW AND PRACTICE § 301.9 (5th ed. 2007). The most well-known assumption in the law is that of the "presumption" of innocence in criminal law. *Id.* Neither of these examples are presumptions in the true sense of the term because they are inserted into the case automatically and do not require the proof of any basic facts before the assumption is imposed. *Id.*

The only real presumption in prescriptive easement cases is what has been referred to as the counter-presumption of adverseness: "proof that the use by one of another's land has been open, notorious, continuous, uninterrupted, and for the required time, creates a

3

*presumption* that the use was *adverse*, unless otherwise explained." *Northwest Cities*, 13 Wn.2d at 85. This rule creates a presumption as the term is defined by most authorities: "a rule of law that establishes a standardized practice of assuming that Fact B follows from Fact A until Fact B is disproved." 5 TEGLAND, *supra*, § 301.8, at 220-21. Here, Fact A is "proof that the use by one of another's land has been open, notorious, continuous, uninterrupted, and for the required time." When the claimant satisfies his burden as to these elements, the presumption operates to give rise to Fact B: "that the use was adverse." The presumption of Fact B then remains until Fact B is disproved, i.e. "unless otherwise explained." The use of the phrase "unless otherwise explained" shows that this presumption is a real presumption because a "presumption is, by definition, rebuttable." *Id.* at 222

Even in cases where the presumption of adverseness would otherwise arise, an exception to the rule exists, preventing its application: "This last mentioned rule does not apply, however, to vacant, open, uninclosed, unimproved lands." *Northwest Cities*, 13 Wn.2d at 85-86. This exception to the stated rule is often referred to as a counter-presumption, but it is actually a different concept altogether. It is a conflicting presumption, also known as a successive presumption. 9 JOHN HENRY WIGMORE, EVIDENCE IN TRIALS AT COMMON LAW § 2493, at 308 (James H. Chadbourn rev. 1981).[1]

---

[1] Rather than dealing with presumptions, counter-presumptions, and shifting burdens, the rules could be simplified into plain English: a party claiming a prescriptive

4

A counter-presumption is a rare situation in which a party presents sufficient evidence, which one can call Fact C, to defeat the presumed Fact B, and then presents further Fact D, which gives rise to presumed Fact E. *Id.* at 308-09. A conflicting or successive presumption occurs when a party against whom a presumption has already been placed presents Fact D, which gives rise to presumed Fact E, but has not yet presented Fact C, which is the fact needed to defeat the presumed Fact B. In such case the second presumption shifts the burden of production back to the original party. *Id.*

To understand the practical difference between a counter-presumption and a successive presumption it is necessary to discuss how presumptions operate. The initial assumption of permissive use places on the claimant the burdens of production and persuasion. *Id.* § 2487, at 293. The presumption of adverseness relieves the claimant of these two burdens and prohibits the element of adverseness from going to the trier of fact; it gets decided as a matter of law if the trier of fact is satisfied of Fact A. *Id.* at 295. To defeat the presumption, the opponent must satisfy a burden of production—a burden of producing evidence of Fact C. *Id.* at 296. When the opponent satisfies this burden of production, he is back in the same situation as he was originally; like that of the criminal defendant, the opponent has no burden of production or persuasion. *Id.* When the owner

---

easement bears the burden of establishing entitlement to the easement and can do so by showing usage of developed property as a true owner would, but a stronger showing is required in cases of undeveloped land where the claimant must also show that permission was never given. The owner, of course, is always free to introduce contrary evidence.

invokes a successive presumption he simply shifts the burden of production back to the claimant; if the claimant succeeds in this burden of production the initial presumption remains in force, taking the presumed fact away from the trier of fact. *Id.* at 308. A counter-presumption, however, does more than just put the opponent back in his original position; it also puts the claimant back in his original position as well by returning to him the original burden of production that he sought to avoid by use of a presumption. *Id.* § 2487, at 297, § 2493, at 308.

What has been just described is referred to as the Thayer theory of presumptions. *Id.* § 2490. Under the Thayer theory the burden of persuasion never shifts. The burden of production shifts and a failure to satisfy that burden will result in the court directing the trier of fact's decision as to one fact or another.

A competing theory, the Morgan theory, operates to shift the burden of persuasion. 5 TEGLAND, *supra*, § 301.13, at 237. Rather than conclusively directing the trier of fact's decision as to the disputed fact, the party upon whom the burden has been placed has to defeat the presumed fact by a preponderance of the evidence, or whatever quantum of evidence is required by the particular case. *Id.* § 301.16, at 249. Like the Thayer theory, this theory also relieves the benefiting party of their burden of production, but once contradictory evidence is produced the presumption does not disappear. Instead, the party against whom the presumption operates still carries the burden of persuasion on that issue. *Id.* § 301.15, at 241-42.

6

Depending on the underlying case-type, Washington follows either the Thayer theory or the Morgan theory, but in many instances Washington fails to consistently follow either theory. *Id.* § 301.13, at 237. It is not clear whether Washington applies the Thayer theory or the Morgan theory to the field of prescriptive easement presumptions. The unsettled nature of our approach suggests why readers of our case law can reach contrary positions on what the cases mean.

It is impossible to tell from the language of *Northwest Cities* whether the presumption of adverseness and the successive presumption of permissive use in open, unenclosed land cases are Thayer or Morgan presumptions. However, when the two presumptions come into conflict they do not operate like normal Thayer presumptions— shifting the burden of production back and forth. Instead, the second cancels out the first without requiring any showing of the Fact C, which would negate the presumption of adverseness under the Thayer theory. *Northwest Cities*, 13 Wn.2d at 85-86. Perhaps not surprisingly, negation is actually what Morgan proposed to do with conflicting or successive presumptions in his great essay on presumptions. Edmund M. Morgan, *Some Observations Concerning Presumptions*, 44 HARV. L. REV. 906, 932 (1931). The application of the Morgan theory of conflicting presumptions suggests that the underlying presumptions should also operate like Morgan presumptions.

*Northwest Cities*, however, is not the end-all of "presumptions" in prescriptive easement cases. The court also dealt with these presumptions prior to and after that

7

decision in *Scheller v. Pierce County*, 55 Wash. 298, 104 P. 277 (1909); *State ex rel. Shorett v. Blue Ridge Club, Inc.*, 22 Wn.2d 487, 156 P.2d 667 (1945); *Roediger*, 26 Wn.2d 690; and *Cuillier*, 57 Wn.2d 624. Each of these cases will be taken up in turn.

*Scheller* actually preceded *Northwest Cities* by decades. *Scheller* established that evidence of a license prevents application of the presumption of adverseness that had been discussed in other cases. *Scheller*, 55 Wash. at 301. At that time, the Morgan theory of presumptions was still two decades away and the Thayer theory dominated the law. The *Scheller* case, applying the Thayer theory, simply held that evidence of a license satisfies that elusive Fact C and defeats the presumed Fact B. Evidence of a license defeats the presumption of adverseness (as opposed to creating a successive presumption like in *Northwest Cities*) because it is direct evidence of permissive use. *Northwest Cities* created a successive presumption because evidence that the land was open, unenclosed, and unimproved has no direct bearing on whether the use was permissive or adverse; its weight is merely inferential.

*Shorett* came out 3 years after *Northwest Cities* and nearly 15 years after Morgan's article popularized an alternative theory of presumptions. *Shorett* was a case about the successive presumption discussed in *Northwest Cities* being applied to the facts of an actual case in the manner advocated by Morgan. In *Shorett*, it was possible that the claimants could have made use of the presumption of adverseness, but the successive presumption of permissive use canceled it out: "The tracts of land in question are wild,

8

uncultivated and unenclosed; hence, the use to which the public subjected those tracts is presumed to have originated by permission." *Shorett*, 22 Wn.2d at 494. This left the initial assumption of permissive use in place, and because the claimants did not have any evidence of adverse use, their claim failed. *Id.* at 495.

The next year, *Roediger* made changes to the field by introducing inferences into the mix. Inferences, like assumptions and irrebuttable presumptions, are another variety of false presumption. 5 TEGLAND, *supra*, § 301.9, at 223-25. "An *inference* is a conclusion that the jurors are allowed to make upon proof of certain facts." *Id.* at 225. Unlike presumptions, inferences do not switch the burden of production or the burden of persuasion and are by definition permissive—not mandatory. *Id.* ("The cases occasionally use the term *permissive inference*, but the term is redundant. An inference is, by definition, permissive."). One of the most well-known inferences is the one found for intent to commit burglary in 11A WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 60.05 (3d ed. 2008): "A person who enters or remains unlawfully in a building may be inferred to have acted with intent to commit a crime against a person or property therein." By treating this as an inference, rather than as a presumption, jurors are able to do what they otherwise could not do because of the assumption of innocence.[2]

---

[2] The burglary inference of intent does not violate the constitution because the jurors are free to decide its weight, if any; thus, the inference does not place on the

The majority tries to stay above the morass of presumptions and inferences (and save us all from this intellectual headache) by taking the position that *Roediger* prevents the presumption genie from ever coming out of the bottle as opposed to creating either a conflicting presumption or permissive inference that allows the judge or jury to put it back into the bottle. Despite the majority's best intentions, the situation described in its opinion is just another successive presumption operating in the Morgan style. The majority recognizes that the *Roediger* court was faced with a situation where the burden of production with respect to Fact A had been satisfied, and which would normally give rise to the presumption of Fact B—adverse use. It then argues that *Roediger* keeps the presumption from arising in the first place where the judge acting as gatekeeper finds that there is some shred of evidence (silent use among neighbors) from which a reasonable person could infer permissive use.

This argument, however, only creates a distinction without a difference. Under the majority's view, we have a situation where a presumption would normally arise, and in the pretrial stage the opposing party does not present Fact C—direct evidence of permissive use—that would defeat the presumed Fact B. Instead, the opposing party presents another set of facts that the majority believes *Roediger* to hold as canceling out the initial presumption or otherwise preventing it from ever coming into effect. As

---

defendant any burden of production or persuasion. *State v. Brunson*, 128 Wn.2d 98, 111, 905 P.2d 346 (1995).

10

already discussed, a set of facts that does not directly counter a presumed fact, but which could instead call the presumed fact into doubt can by operation of the law give rise to a conflicting or successive presumption which, under the Morgan theory, cancels out the two presumptions.

Contrary to the majority's reading of *Roediger*, that case created the inference of permissive use when it held that the successive presumption of permissive use that applies in cases of unenclosed land can be used in cases where it would be otherwise inapplicable "where it is reasonable to infer that the use was permitted by neighborly sufferance or acquiescence." *Roediger*, 26 Wn.2d at 707. What *Roediger* did was to create another set of circumstances from which to presume Fact E. Thus, in cases where the owner of the servient estate fails to present Fact C to defeat presumed Fact B and fails to present Fact D from which the conflicting presumed Fact E arises to defeat presumed Fact B, the owner of the servient estate can still obtain a presumption of Fact E if he convinces the trier of fact that it is reasonable to infer Fact F "that the use was permitted by neighborly sufferance or acquiescence." *Id.*

Consistent with the idea that prescriptive rights are disfavored by the law, *Roediger* lowered the bar further for owners of would-be servient estates to protect their property. By introducing an inference into the mix, the owner of the servient estate no longer had to present actual evidence of neighborly sufferance or acquiescence; he just needed evidence of circumstances where it would be reasonable to infer that that was

11

what happened. The majority suggests in footnote five of its opinion that *Roediger* used the concepts of implication/inference and presumption interchangeably. However, I see no evidence of confused use of the two concepts by *Roediger*; indeed, the majority does not point to or explain any such instances. Furthermore, just because Bryan Garner says that modern jurists often confuse the concepts does not mean that we have to and does not mean that the court did not know better in 1946.

Finally, *Cuillier* is a case where the Washington Supreme Court agreed that under the circumstances the trial court correctly applied the inference of neighborly accommodation recognized in *Roediger*. *Cuillier*, 57 Wn.2d at 624. *Cuillier* made it clear that application of the *Roediger* inference is a matter solely for the trier of fact to decide:

> The trial court was clearly entitled to find, from all of the circumstances, the ultimate fact that the defendants' use of the road was permissive and not adverse. Whether or not we would have made the same finding (and we would) is not material; *the finding of the trial court on factual issues will not be disturbed* where credible evidence and the legitimate inferences therefrom sustain it.

*Id.* at 628 (emphasis added). The fact that *Cuillier* placed the decision to apply the disputed presumption/inference in the hands of the trier of fact is further evidence that the court created an inference rather than a presumption.

It is with this background that the Gamboas, very understandably, rely upon the factually similar case of *Drake v. Smersh*, 122 Wn. App. 147, 89 P.3d 726 (2004). There,

12

as here, the plaintiff's predecessor owned an adjoining piece of property that was accessed through the driveway located largely on the defendant's land. *Id.* at 149. Plaintiff's predecessor used the driveway extensively and even expanded it on to his own property with the knowledge of defendant's predecessor. The use continued unchanged over several decades and succeeding owners of both properties. *Id.* Both plaintiff and his predecessor maintained the driveway as necessary and without objection from the defendant and his predecessors. *Id.* at 149-50. After originally ruling for the defendant on a theory of neighborly accommodation, the trial court reversed itself on reconsideration and awarded plaintiff a prescriptive easement, reasoning that the accommodation had ended with the original owners of the property. *Id.* at 150-51.

Division One affirmed, rejecting the defendant's argument that the record supported an inference of continued accommodation and concluding that there was sufficient evidence of adverse use. *Id.* at 149. Noting that adverse use was the only question in the case, *Drake* summarized the relevant law this way:

> In Washington, a claimant's use is adverse when he "uses the property as the true owner would, under a claim of right, disregarding the claims of others, and asking no permission for such use." A court may determine adversity from the actions of the claimant and the property owner. Use is not adverse if it is permissive. Whether use is adverse or permissive is generally a question of fact, but if the essential facts are not in dispute, it can be resolved as a question of law.

*Id.* at 152 (footnotes omitted) (quoting *Kunkle v. Fisher*, 106 Wn. App 599, 602, 23 P.3d 1128 (2001)).

13

Clarifying one of its earlier opinions, *Drake* ruled that when there is evidence of neighborly accommodation, "a court may *imply* that use was permissive and accordingly conclude the claimant has not established the adverse element of prescriptive easements." *Id.* at 154. It rejected use of a *presumption* of permissive use, limiting such presumptions solely to the case of undeveloped land. *Id.* It then turned to the question of whether there was *evidence* of permissive use of the driveway and found none despite the long-term knowledge by the defendant and his predecessors about plaintiff and his predecessor's use of the driveway. *Id.* at 154-55. The court ultimately turned to the issue of whether the evidence supported the trial court's finding of adverse use. *Id.* at 155. The long use of the driveway as if they were the owners, along with the extension of the driveway onto their own property and development of a house and garage there, was sufficient to establish adverse use. *Id.*

The majority speculates that *Drake* would have reached a different outcome if there had been evidence of permissive use, thus triggering some type of presumption in favor of the property owner. Majority at 16-20. In addition to being speculative, that is not a fair reading of *Drake*. The analysis in *Drake* immediately follows the recognition that Division One had erred in an earlier case by treating the *implication* of neighborly accommodation as a *presumption*. 122 Wn. App. at 153. *Drake* explicitly noted that Professor Stoebuck had criticized its earlier decision on that basis. *Id.* at 153 n.16 (citing 17 WILLIAM B. STOEBUCK, WASHINGTON PRACTICE: REAL ESTATE: PROPERTY LAW §

14

2.7, at 101 (1995)). In the current version of his treatise, the late Professor Stoebuck maintained his view that our cases provide that only unenclosed land is afforded a presumption of permissive use; in all other cases the claimant can present evidence of nonpermissive use raising a presumption of adverse or hostile use. 17 WILLIAM B. STOEBUCK AND JOHN W. WEAVER, WASHINGTON PRACTICE: REAL ESTATE: PROPERTY LAW § 2.7, at 102 (2d ed. 2004). There simply is no basis for concluding that there is any type of presumption in favor of the property owner of developed land once the claimant has produced evidence of adverse use. *Drake*, thus, correctly concluded that there was no presumption in favor of permissive use in cases involving developed property.

Proper application of these cases to the trial court's decision leads to the conclusion that this court's judgment should not be substituted for that of the trier of fact. The Gamboas presented evidence sufficient to give rise to the presumption of adverseness by showing that they treated the driveway as their own for many years. The Clarks did not defeat the presumption of adverseness with evidence of the land being open and unenclosed or with credible evidence (as determined by the trier of fact) of actual permission. There was evidence from which the trier of fact could have reasonably inferred that the Gamboas' use of the road was "permitted by neighborly

15

sufferance or acquiescence." However, the trier of fact chose not to credit that evidence and apply the inference. It is not for us to disturb that decision.[3]

Accordingly, I would affirm. Since the majority decides otherwise, I respectfully dissent.

_____
Korsmo, C.J.

---

[3] This appears to be a case where both parties assumed they were owners of the land and acquiesced in the other neighbor using it as good neighbors would. It is unfortunate that their relationship devolved into litigation.