IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| WILLIAMS PLACE, LLC, | ) | |
| | ) | No. 31681-5-III |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THE STATE OF WASHINGTON, by and | ) | |
| through the Department of Transportation, | ) | PUBLISHED OPINION |
| | ) | |
| Respondent. | ) | |

SIDDOWAY, C.J. — Williams Place LLC was formed in 2005 by members of the

Sig Jorstad family to hold land in Whitman County that the family had farmed since the

mid 1950s. The limited liability company filed this inverse condemnation action in 2007,

after the Washington State Department of Transportation (WSDOT) ordered the LLC's

neighbor to the east to remove a bridge across Paradise Creek. Evidence was presented

that a bridge at that location had provided the Jorstad family and its predecessors with

access from the farm to county roads since 1882. With the removal of the bridge,

Williams Place contends that a portion of its land is landlocked. It advances a number of

theories in support of a right of access that was taken by WSDOT's 2007 order to remove the bridge.

The loss of a right to access after such a long period of use is unusual. But review of the history of the property reveals that in this atypical case, predecessors in interest to the Jorstad family lost legal options for access to their southernmost ground incrementally, either voluntarily or without objection, over decades. Williams Place retains the options of applying for access using an easement it has obtained from Whitman County. Because the trial court properly concluded that Williams Place had not demonstrated a genuine issue of fact that it had a legal right that was taken or damaged by WSDOT, we affirm.

## FACTS AND PROCEDURAL BACKGROUND

Williams Place LLC owns 220 acres in Whitman County that is bisected by the Moscow-Pullman Highway, State Route (SR) 270. Most of the property (194 acres) is located on the north side of the highway, with approximately 26 acres located to the south. The property has been owned and farmed by the Jorstad family since the mid 1950s. For estate planning purposes, members of the Jorstad family formed and transferred title to Williams Place in 2005.

Paradise Creek runs along the south side of the Moscow-Pullman Highway on the Jorstad land. Before 2007, a bridge existed over the creek on land owned by the Jorstad family's neighbor to the east, close to milepost 6.9 on SR 270. As of the time this lawsuit

2

was commenced, the owner of the land was Motley-Motley, Inc. (Motley). The Jorstad

family and its predecessors have used bridges at the location, now identified as milepost

6.9 on SR 270, for as many as 125 years, although the viability of the bridges and the

extent and continuity of their use is in dispute.

The parties' dispute over the legal right, if any, that the Jorstad family acquired as

a result of its historical use of the bridge requires an understanding of county, railroad

and private conduct affecting the property since the 1880s.

In 1881 the federal government conveyed to George W. Pinnell, by patent, the

land presently owned by the Jorstads through Williams Place. In 1882, the federal

government conveyed to John P. Collins, also by patent, the land presently owned by

Motley. As shown in the simplified illustration below,[1] all of the land conveyed to Mr.

Pinnell, the Jorstad family's predecessor, was located in the Northeast Quarter of Section

2, Township 14 North, Range 45 East, W.M. All of the land conveyed to Mr. Collin's,

Motley's predecessor, was in the Northwest Quarter of Section 1 of the same township

and range. All references hereafter to "Section 2" and "Section 1" are to sections 2 and 1

of Township 14 North, Range 45 East, W.M.

---

[1] Our illustrations are variations on an illustration provided in WSDOT's brief. While not to scale and not in the record, it is a simple illustration of the legally significant features of portions of the Jorstad and Motley properties depicted in Williams Place's images at Clerk's Papers (CP) at 786-88.

3

JORSTAD/MOTLEY PROPERTIES, CIRCA 1882:

As shown by the illustration, the Jorstad and Motley properties were originally served by Garrison Road, a former county road built in approximately 1882. Garrison Road ran generally east and west, south of Paradise Creek. The road included a spur that ran north across Paradise Creek. While the northern spur including the bridge across Paradise Creek was located in Section 2, owned by Motley's predecessor, it was a county road that the Jorstad family's predecessors were entitled to use.

In 1886, Mr. Pinnell sold a strip of land 100 feet in width across his land to the Columbia and Palouse Railroad Company for the company's use in building and

maintaining a railroad. He was paid $60 for the property. Motley's predecessor had

conveyed an essentially identical right-of-way to the railroad in 1885.

JORSTAD/MOTLEY PROPERTIES, CIRCA 1890:



The railroad right-of-way bisected Mr. Pinnell's farm ground in Section 2,

creating an impediment to unfettered movement between the north and south portions of

his property. But Mr. Pinnell was still able to use Garrison Road to cross the railroad

right-of-way and to cross Paradise Creek in traveling between the north and south

portions of his land.

In 1933, in anticipation of Whitman County's construction of a new county road north of Paradise Creek to replace Garrison Road, Lewis and Nellie Brosa—who had by then acquired what had been Mr. Pinnell's land and would later become the Jorstad family property—conveyed a right-of-way 80 feet in width to the county. They executed a waiver of "all claims for damages of whatever kind which may be occasioned to said land or premises, or to any portion thereof, or to the undersigned by the location, establishment, opening and use of said road." CP at 96. The replacement road was referred to as Secondary Road No. 11. It would later become Primary State Highway No. 3, which would later become SR 270.

When construction of Secondary Road No. 11 was completed in 1935, the Board of County Commissioners of Whitman County vacated Garrison Road, finding that it had been "thrown into disuse by reason of the establishment and construction of Secondary Road Project No. 11 and . . . [was] not being used by vehicular traffic." CP at 102. The order vacating the road recited the fact that notice had been given of the Board's plan to vacate the road and that "no objection [had] been made to vacating said road." *Id.*

6

JORSTAD/MOTLEY PROPERTIES, CIRCA 1935:

The parties dispute the practical and legal effect of the vacation. The Jorstad family contends that Garrison Road and the bridge were still being used and maintained by owners of property formerly abutting the road, whom they contend continued to enjoy a private easement. WSDOT contends that upon vacation, fee title reverted to the abutting landowners and that the Paradise Creek bridge fell into a state of disrepair.

In 1950, the State undertook improvements that would result in the county's Secondary Road No. 11 becoming a state highway. By that time, the land formerly owned by Mr. Pinnell and the Brosas and that would later become the Jorstad property

7

was owned by George C. Williams and Ruby May Williams. Both the Williamses and

Motley's predecessor sold property needed by the State for the highway construction.

Among the property transferred to the State by the Williamses and by Motley's

predecessor was the strip of land located between the railroad right-of-way and the

existing highway, west and east of the Paradise Creek bridge. The result was that what

would become the Jorstad family property no longer abutted what would become SR 270

nor, for that matter, did Motley's. Following the 1950 conveyances, the bridge across

Paradise Creek that was formerly a part of Garrison Road fell within the state-owned

right-of-way.

JORSTAD/MOTLEY PROPERTIES, CIRCA 1951:



8

The Jorstad family purchased the subject property in Section 2 in 1954. In connection with the cross-motions for summary judgment below, members of the Jorstad family provided declarations attesting that at the time they acquired the property, the roadway that served as the former Garrison Road, including the Paradise Creek bridge, continued to provide access to their land south of SR 270. They claimed that after acquiring the property, Jorstad family members maintained and improved the bridge as necessary. Keith Kopf, a Jorstad family member and member of Williams Place LLC, testified that in 1974 or 1975 a truck broke through the deck of the Paradise Creek bridge, requiring reconstruction. According to Mr. Kopf, the bridge was thereafter completely rebuilt by adding new stringers and decking.

By 1997 the railroad tracks running through the Jorstad and Motley properties were no longer in use. Pursuant to the federal Trails Act, 16 U.S.C. § 1247(d), Blue Mountain Railroad Company, Inc., which was by then the owner of the tracks and right-of-way, executed a donative quit claim deed in favor of Whitman County to use the railroad right-of-way as a recreation trail. The deed conformed to provisions of the Trails Act, under which interim trail use is not considered abandonment of a railroad right-of-way. Following execution of deeds to the railroad's right-of-way, Whitman County constructed what is now the Bill Chipman Trail.

JORSTAD/MOTLEY PROPERTIES, CIRCA 1998:

The Chipman Trail, which opened in 1998, is an 8-mile recreational trail, 10 feet in width, which runs from Pullman to Moscow. Following development of the trail, Jorstad family members were required to cross it in order to reach the Paradise Creek bridge at milepost 6.9 from their farm land south of SR 270.

Also in 1998, a flood damaged the Paradise Creek bridge. Mr. Kopf conceded by declaration that as a result of the flood damage, "our heavier farm equipment and heavy trucks were too big for the bridge," but "the bridge was still used for light traffic after we

10

installed runners to cover the bad spots in the deck." CP at 249. Jeff Motley, who purchased the Motley property in April 2001, provided conflicting evidence, testifying by declaration that no functioning Paradise Creek bridge existed at the time of his purchase. According to him, "the Paradise Creek crossing consisted of the remains of two cement abutments with a few logs spanning the width of the Creek," and, "It was not possible for vehicles to use this structure to access SR 270." CP at 227.

When Motley acquired his property in 2001, Mr. Motley was interested in obtaining access to SR 270, which is a managed access highway. As such, it is subject to chapter 47.50 RCW, which provides for regulation of access through a permitting process. Since Motley's property abutted the Chipman Trail rather than the highway, Motley obtained an easement to cross the county recreation trail. It also applied to WSDOT for a temporary access connection permit to SR 270 to serve commercial rock crushing activity on its property.[2]

---

[2] According to a declaration provided by the project engineer assigned to the design and construction of SR 270, Motley's predecessor, Northwest Paving, Inc., had also applied for and obtained an access connection permit in 1970 that contemplated replacing a flood-damaged Paradise Creek bridge within the State's right-of-way. But according to the engineer, Northwest Paving was never able to obtain an easement from the railroad to cross the railroad's right-of-way. The result was that the bridge was not replaced at that time, the permit issued by WSDOT expired, and, according to the engineer, Northwest Paving used Sunshine Road, which passes through the Motley property further to the east, to access its operations.

Mr. Motley was required to provide plans for the access Motley would construct within WSDOT's right-of-way. It would necessarily include a bridge over Paradise Creek, which flows through the highway right-of-way. WSDOT granted Motley an access connection permit for temporary use near milepost 6.9 on SR 270. The permit was conditioned upon removing the bridge after WSDOT completed its work improving Sunshine Road, an alternative access for Motley that was located to the east. It is undisputed that Williams Place had no financial or other involvement in Motley's construction of the temporary bridge built in 2001. Members of the Jorstad family testified by declaration that they continued to use the route of the former Garrison Road to access SR 270, crossing the reconstructed bridge.

In August 2007 WSDOT advised Motley that construction of Sunshine Road was complete and that Motley's temporary access connection permit was being canceled. It ordered Motley to remove the bridge over Paradise Creek within 30 days. Motley complied, removing the Paradise Creek bridge in September 2007.

*Procedural history*

Members of the Jorstad family had communicated with WSDOT representatives and were aware since at least the spring of 2007 that as soon as Sunshine Road was operational, Motley would be removing the temporary bridge and a guardrail would be installed along SR 270 at Motley's existing access location. Within a week of Motley's removal of the bridge, Williams Place brought this inverse condemnation action. It

12

alleged that WSDOT's actions had "damaged the value of Williams Place's property, including, but not limited to a resulting loss of use of the property, and loss of access rights previously acquired." CP at 4. Several months later, it filed a motion for partial summary judgment that was met by a cross motion for summary judgment by WSDOT.

In a written memorandum decision on the cross motions, the trial court found only two material issues to be undisputed: it found that WSDOT owned the property where the Paradise Creek bridges at issue had been located, and that the bridge to which Williams Place claimed a right of access had been removed "in 2001"[3] through state action by WSDOT. It concluded that factual disputes existed as to other material issues.

The trial court also concluded that resolution of one contested issue—whether title to the railroad right-of-way on Williams Place's land reverted to Williams Place upon abandonment of the railroad—required joinder of Whitman County and the railroad as necessary parties.

In 2009 Williams Place sought to resolve that issue through a quiet title action against Whitman County and Blue Mountain Railroad. It alleged that the railroad had only an easement for railroad purposes that it abandoned by the late 1990s, causing title to revert to the Jorstad family. Rather than litigate the dispute to resolution, Williams

---

[3] It is not clear whether "2001" was a scrivener's error, inasmuch as Williams Place asked the court to determine that the bridge was removed in 2007 through state action. The court might have regarded the 2001 construction of the temporary bridge, conditioned on a promise of removal, as the effective date of removal.

Place, Whitman County and the railroad reached an agreement under which Whitman County granted a 60 foot separated grade easement that allows Williams Place to construct a crossing over or under the Chipman trail, within the Northeast Quarter of Section 2. The location of the negotiated easement is near milepost 6.7 of SR 270, approximately two-tenths of a mile west of the historic bridge site. The easement provides that the county will grant Williams Place an alternate easement at a different location in the event the easement cannot be located as described because of local, state, or federal laws or regulations. The parties stipulated to dismissal of the quiet title complaints.

Williams Place then filed a renewed motion for partial summary judgment in this action, which was met with a renewed cross motion for summary judgment by WSDOT. Having heard argument from the parties, the trial court issued a memorandum decision denying Williams Place's motion and granting WSDOT's. While finding that WSDOT directed removal of Motley's temporary bridge and that there was substantial evidence that the Jorstad family and its predecessors used a bridge at the historic location for a lengthy period of time, the court concluded that Williams Place had "failed to present any evidence . . . that it has a property right of record or by operation of law to use this route, or that the historic use of this route was anything more than a permissive use." CP at 912. Williams Place appeals.

14

ANALYSIS

The critical issue on which the trial court found Williams Place's claim of inverse condemnation to fail was its inability to demonstrate any genuine issue that it had a property right that was taken or damaged by WSDOT. Williams Place asserts six alternative bases on which it presented evidence of such a right. It contends:

> It has a right as a landowner abutting SR 270 arising from the 20+ acres in the Northeast Quarter of Section 2 that it owns in fee, or

> It has a right as a landowner with an easement over the Northwest Quarter of Section 1 that connects to SR 270, because

>> Upon the vacation of Garrison Road and the termination of the public easement in that roadway, Williams Place—as the owner of land that had abutted Garrison Road—retained a private easement, or

>> It enjoys an implied easement, or

>> The evidence supports a prescriptive easement, or

>> It can claim an easement by necessity; or

> It has a right as a nonabutting landowner presenting special circumstances of the sort recognized in *Union Elevator & Warehouse Co., Inc. v. Department of Transportation*, 96 Wn. App. 288, 980 P.2d 779 (1999).

Alternatively, Williams Place argues that WSDOT is estopped to deny that it has a property right that was taken.

15

We address in turn these bases on which Williams Place asserts a property right in fact, or by estoppel, that was taken or damaged by WSDOT.[4]

*I.     Elements of action and standard of review*

Article I, Section 16 of the Washington Constitution provides that "[n]o private property shall be taken or damaged for public or private use without just compensation having been first made." An "inverse" condemnation occurs when the government takes or damages property without the formal exercise of the power of eminent domain. *Dickgieser v. State*, 153 Wn.2d 530, 534-35, 105 P.3d 26 (2005). The elements required to establish an inverse condemnation claim are: "(1) a taking or damaging (2) of private property (3) for public use (4) without just compensation being paid (5) by a governmental entity that has not instituted formal proceedings." *Id.* at 535.

The trial court granted WSDOT's motion for summary judgment, which had contended that Williams Place could not demonstrate a genuine issue of fact as to the essential element that it held a property right that WSDOT took or damaged. "There can be no inverse condemnation if no property right exists." *Granite Beach Holdings, L.L.C.*

---

[4] Williams Place devotes a portion of its brief to an argument that WSDOT lacks standing to assert claims of the county, adjacent landowners, and the railroad, none of whom, it contends, ever disputed that Williams Place and its predecessors could continue to use the former Garrison Road. We do not construe WSDOT's arguments about the property rights of third parties as being an attempt to assert claims on their behalf. Rather, understanding the property rights of third parties is a necessary part of determining whether Williams Place has met its burden of producing evidence that it owns the property right it claims was taken or damaged by WSDOT.

*v. Dep't of Natural Res.*, 103 Wn. App. 186, 205, 11 P.3d 847 (2000); *Galvis v. Dep't of Transp.*, 140 Wn. App. 693, 707, 167 P.3d 584 (2007). In moving for summary judgment, the burden was on WSDOT, as the moving party, to show the absence of an issue of material fact. *Young v. Key Pharm., Inc.*, 112 Wn.2d 216, 225, 770 P.2d 182 (1989). If WSDOT met that burden, the burden shifted to Williams Place, as the nonmoving party, to set forth specific facts to rebut the moving party's contentions and show that a genuine issue existed. *Seven Gables Corp. v. MGM/UA Entm't Co.*, 106 Wn.2d 1, 13, 721 P.2d 1 (1986). A nonmoving party may not defeat a motion for summary judgment by relying on speculation or argumentative assertions that unresolved factual issues remain. *White v. State*, 131 Wn.2d 1, 9, 929 P.2d 396 (1997).

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. CR 56(c). We review a grant of summary judgment de novo, viewing the facts in the light most favorable to the nonmoving party, here Williams Place. *Dickgieser*, 153 Wn.2d at 535.

## II. *Williams Place's right as an abutting landowner based on the 20+ acres it owns in fee*

The owner of property that abuts a public street or highway has an easement of access for ingress and egress to and from such roadways. *State v. Calkins*, 50 Wn.2d 716, 718, 314 P.2d 449 (1957). This right of ingress and egress to a public way attaches to the land and is a property right "as complete as ownership of the land itself." *Walker*

17

*v. State*, 48 Wn.2d 587, 590, 295 P.2d 328 (1956). An abutting property owner is therefore entitled to compensation if its right of access is taken or damaged for a public use. *Keiffer v. King County*, 89 Wn.2d 369, 372, 572 P.2d 408 (1977).

In 1991 the Washington legislature enacted the Washington Highway Access Management Act (HAMA), chapter 47.50 RCW, which "establishes a framework to regulate access points to state highways." *Galvis v. State Dep't of Transp.*, 140 Wn. App. 693, 704, 167 P.3d 584 (2007). In *Galvis* our court upheld the constitutionality of the HAMA against both facial and as-applied challenges that it violated article I, section 16 of the Washington Constitution. Prior Washington cases had held that not all impairments of access are compensable, and that compensation is properly denied where an impairment of access is not substantial. *Id.*, at 703 (citing *Keiffer*, 89 Wn.2d at 372). As the court explained in *Galvis*, "Chapter 47.50 does not permit the State to eliminate all direct access without paying compensation, recognizing that '[e]very owner of property which abuts a state highway has a right to reasonable access to that highway'" and that the HAMA "recognizes the right to compensation under article I, section 16 of the Washington Constitution." *Id.*, at 704 (quoting RCW 47.50.010(3)(b) and citing RCW 47.50.010(5)). Instead, "the legislature recognized an abutting property owner's right to reasonable access and did not intend for the [WSDOT] to apply the statute in a manner that infringes on those rights." *Id.*

Property abuts upon a public street or highway "when there is no intervening land

18

between it and the street." *Davidson v. Kitsap County*, 86 Wn. App. 673, 684, 937 P.2d 1309 (1997). In other words, a property abuts if "the lot line and street line are in common." *Id.* at 684-85 (citing *Kemp v. City of Seattle*, 149 Wash. 197, 201, 270 P. 431 (1928)).

It is undisputed in this case that the Chipman Trail lies between Williams Place's property and the state highway and highway right-of-way. In the first round of summary judgment cross motions, the parties disputed the significance of the existence of the trail: WSDOT argued that by virtue of the trail, Williams Place could not establish that the acreage to which it holds fee title abuts the state highway; Williams Place argued that title to the railroad right-of-way reverted to the Jorstad family when the railroad ceased to use it to operate a railroad. After the trial court ruled that Whitman County and the railroad were necessary parties to that dispute, Williams Place pursued its claim of reverted title in quiet title actions. It ultimately compromised the quiet title litigation by accepting a separated grade easement over the Chipman trail from its property in Section 2—an easement located about two-tenths of a mile west of the historic Paradise Creek bridge crossing. While Williams Place still makes passing reference on appeal to the unresolved dispute over whether it acquired title to the railroad right-of-way by reversion (*see* Br. of Appellant at 19-20), its abiding view that it holds reverted title is not material to this appeal. In the trial court, it observed that after it acquired its easement over the

19

Chipman trail, the issue became a red herring.[5]

WSDOT represents on appeal, as it did in the trial court, that "because Williams Place now has an easement allowing it to reach SR 270 at milepost 6.7, WSDOT would be willing to consider granting it an access permit at that location, obviously very near the milepost 6.9 access that is at issue in this case." Br. of Resp't at 10. Williams Place has not replied to the offer, but implicitly rejects it. Instead, it argues that it enjoys grandfathered rights under chapter 47.50 RCW to easement rights that existed in 1991, when the HAMA was adopted. *See* RCW 47.50.080(1) (addressing continuing rights to use unpermitted connections to the state highway system in existence on July 1, 1990).

Because Williams Place does not rely for its rights as an abutting landowner of the land it owns in fee, we turn to its arguments that WSDOT took or damaged its easement right on a route from its land to SR 270 across the site of the historic Paradise Creek bridge.

---

[5] In its renewed motion for summary judgment, Williams Place argued:

Because Williams Place was only interested in confirming and preserving its access rights, it agreed to limit its property interest across the former Railroad Right of Way to reducing it to an easement. . . . In any event, whether through the reversionary interest that occurred when the use of the property as a railroad ceased, or by virtue of the easement subsequently obtained by Williams Place, WSDOT's red-herring argument is now legally and factually moot.

CP at 451.

### III. *Williams Place's asserted right to an easement*

A property owner whose property line does not abut a highway but who has a private easement right connecting his property to the highway has a right of access equivalent to that of an abutting owner. WAC 468-51-030(1) ("Every owner of property which abuts a state highway, *or has a legal easement to the state highway* . . . has a right to reasonable access . . . to the state highway system." (emphasis added)). His easement right cannot be taken or damaged without just compensation. *State v. Kodama*, 4 Wn. App. 676, 679, 483 P.2d 857 (1971) (for the State to block a private easement road that connects a property owner with a public road is a taking). Williams Place asserts a private easement right under four theories.

### A. *Retention of a private easement after Whitman County vacated Garrison Road*

Williams Place first argues that its predecessors obtained a private easement to use the Garrison Road route when the road was constructed in 1882, and that its private easement was not extinguished when Whitman County vacated the road in 1935.

The public has an easement of use in a public street or highway; the fee rests in the owners of the abutting property. *Bradley v. Spokane & I.E.R. Co.*, 79 Wash. 455, 458, 140 P. 688 (1914). The state has plenary power over public streets and may vacate the public easement therein. *London v. City of Seattle*, 93 Wn.2d 657, 663, 611 P.2d 781 (1980). It may invest counties with the authority to vacate roads and had done so by

21

statute before the Whitman County commissioners vacated Garrison Road in 1935. *See id.* (addressing municipal authority to vacate); REM. REV. STAT. § 6450-51. Upon vacation of a street or highway, title reverts to the abutting property owners. *Woehler v. George*, 65 Wn.2d 519, 524, 398 P.2d 167 (1965).

The board of county commissioners' order vacating Garrison Road in 1935 describes the portion vacated as including the portion "BEGINNING at a point on the said Garrison Road over, across and through Section 3, 2 and 1, Township 14 North, Range 45," and from there, through other sections. CP at 103. No evidence has been presented that the board's order did not fully and finally vacate all parts of Garrison Road that were located in Section 2 and Section 1, as it appears to do.

Williams Place argues, however, that when a public road is vacated, "only the public aspect of the easement is eliminated," and "[i]f the road is used to access property adjacent to it, the vacation does not eliminate the private easement necessary for the use and benefit of the adjacent property." Br. of Appellant at 21, citing *Howell v. King County*, 16 Wn.2d 557, 134 P.2d 80 (1943). It cites *Van Buren v. Trumbull*, 92 Wash. 691, 159 P. 891 (1916) and *Curtis v. Zuck*, 65 Wn. App. 377, 829 P.2d 187 (1992) for the same proposition.

*Van Buren, Howell* and *Curtis* present a distinguishable issue arising under a statutory provision that operated to vacate roads dedicated between 1890 and 1904 that

22

were not opened within five years. Before 1890, if a county authorized a county road but failed to open it, the common law doctrine of abandonment applied. *Real Progress, Inc. v. City of Seattle*, 91 Wn. App. 833, 836-37, 963 P.2d 890 (1998). In 1890 the legislature enacted a "nonuser" statute governing the creation of county roads that provided for automatic vacation in the event the road was not timely opened for public use. It provided:

> [a]ny county road, or part thereof, which has heretofore been or may hereafter be authorized, which remains unopened for public use for the space of five years after the order is made or authority granted for opening the same, shall be and the same is hereby vacated, and the authority for building the same barred by lapse of time.

*Id.* (quoting LAWS OF 1889-90, ch. 19, § 32 at 603).

In 1907 the Washington Supreme Court held that the nonuser provision operated to vacate not only roads laid out by a county's board of commissioners, but even streets that private developers had dedicated as such in plats of property, if the property fell outside the limits of an incorporated city or town. *Murphy v. King County*, 45 Wash. 587, 88 P. 1115 (1907). The legislature immediately reacted to *Murphy*, amending the nonuser provision in the next legislative session by adding a proviso that it would not operate to vacate streets dedicated as such in private plats. *Real Progress*, 91 Wn. App. at 837.[6] The

---

[6] For plats as to which the five year nonuse period had not already run, the 1909 amendment provided that "any highway, street, alley or other public place dedicated as such in any plat" was not subject to the automatic vacation provision. *Gillis v. King County*, 42 Wn.2d 373, 375-76, 255 P.2d 546 (1953) (citing LAWS OF 1909, ch. 90, § 1 at 189).

proviso continues to exist in the current nonuser statute, codified at RCW 36.87.090.

The cases principally relied upon by Williams Place all address the impact of statutory vacation for nonuse on property owners whose right (or predecessors' right) to use dedicated streets was arguably affected during the 14 years before the legislature countermanded the result required by *Murphy*.[7]

The first of the decisions cited by Williams Place is *Van Buren v. Trumbull* which concluded that owners who had purchased with reference to a plat enjoyed a private easement to streets dedicated as such in the plat—a right that was unaffected by abandonment. *Van Buren* began its analysis with the principle that "[o]ne who plats property upon which streets have been laid out, and who sells property with reference thereto, cannot, by an act of his own, defeat the right of his vendee to use the platted streets for the purposes intended. He is estopped to deny or impeach rights thus acquired." *Id.* at 693.

From there, the court reasoned:

Now it would seem if the vendor or dedicator of land could not, by any act of his own, deny to his vendee a right to at least an easement in the property theretofore dedicated as a street, that one claiming by, through, or under him could not do so. As between the grantees of a common grantor who had platted and sold land, rights are to be primarily determined by reference

---

[7] The Supreme Court later recognized that it had interpreted the nonuser statute too broadly but declined to overrule *Murphy*, which had "become and remained a rule of property." *Real Progress*, 91 Wn. App. at 839 (quoting *Tamblin v. Crowley*, 99 Wash. 133, 138, 168 P. 982 (1917)).

24

to the right of the grantor. That is to say, if the common grantor could not deny the full effect of his deed and the right of ingress and egress, his grantee could not do so.

*Id.* at 694. Turning to the nonuser statute enacted in 1890, the Court stated that the statute "makes no mention of private rights and cannot be held to, in any way, affect them." *Id.* It concluded that "the logical assumption must be that the Legislature intended no more than to waive the interest of the public in so far as it was represented by the municipality." *Id.* at 694-95.

*Howell* and *Curtis*, which Williams Place also cites, involved the same type of private easement in a dedicated street arising from the sale of lots with reference to a plat. Both decisions relied on *Van Buren*'s holding that an independently-existing private right was unaffected by the nonuser provision. *E.g.*, *Howell*, 16 Wn.2d at 559 (plaintiff retained a private easement to Hume Avenue that was dedicated in 1891, was depicted on the plat as serving her lot, but was not opened as a public road within five years of dedication); *Curtis*, 65 Wn. App. at 378-79 (plaintiffs held a private easement to Glass Street (and thereby to Bennett Street, developed in its stead) where the street was dedicated in 1888, was depicted as serving the plaintiffs' lot, but was not opened as a public road within five years of dedication).

In an effort to bring its circumstances within the principles established by the *Van Buren* line of cases, Williams Place points out in its reply brief that in the CODE OF 1881, § 3047, the Legislature required each county auditor to maintain a "highway plat book"

25

depicting all legally established roads within the county, with appropriate references to the records establishing each road. Section 3047 was the penultimate section of chapter 236 of the CODE OF 1881, which was entitled "Legalization of County Roads." Earlier sections of the chapter dictated how counties should re-survey, plat and record any county road whose "location cannot be accurately defined by the papers on file in the proper county auditor's office, or where, through some omission or defect, doubts may exist as to [its] legal establishment." CODE OF 1881, §§ 3041-46.

The 1881 legislature's use of the term "plat"[8] ("highway plat book") for maps to be included in the county's required record of its public roads provides no basis for extending the principles of the *Van Buren* line of cases to this different context. The existence of a plat in the nonuser cases was significant because when a developer lays out and dedicates streets in a plat it amounts to a promise of a street, for which a grantee pays consideration and from which a grantor profits. As explained in *Van Buren*, a grantor selling property with reference to a plat upon which streets have been laid out could not defeat the right of its grantee under

> [t]he doctrine [that] has for its object the suppression of fraud and the enforcement of honesty and fair dealing. Where, therefore, lots have been

---

[8] "Plat" is defined to mean

"1. A small piece of land set apart for some special purpose; PLOT (1). 2. A map or plan of delineated or partitioned ground; esp., a map describing a piece of land and its features, such as boundaries, lots, roads, and easements; PLAT MAP." BLACK'S LAW DICTIONARY 1337 (10th ed. 2014).

offered for sale, and have been purchased in accordance with a map or plat

upon which streets are made to appear, it is presumed that the purchase was induced, and the price of the lots enhanced thereby, and the seller is estopped to deny the right which has thus been acquired.

92 Wash. at 693-94.

By contrast, Washington cases dealing with roads that are vacated by legislative action implicitly recognize that all rights of use attributable to the roadway's prior existence as a public road are thereby terminated—with the result that compensation must sometimes be paid. Washington case law provides that "an abutter suffering damage peculiar to himself because of a street vacation is entitled to recover compensation" and "substantial interference with access may constitute a 'taking or damaging' of property requiring compensation." *London v. City of Seattle*, 93 Wn.2d 657, 663, 611 P.2d 781 (1980) (citing *Freeman v. Centralia*, 67 Wash. 142, 120 P. 886 (1912) and *State ex rel. Smith v. Superior Court*, 26 Wash. 278, 66 P. 385 (1901)). As to the time of payment, Washington cases provide that "any injury that . . . vacation might occasion to [an abutting landowner is] effected when the public right to continued use of [a] street [is] terminated," that being the date that legislative action becomes effective. *Id.* at 664.

Accordingly, if the Whitman County commissioners' 1935 order vacating Garrison Road resulted in a loss of access to Lewis and Nellie Brosa (the Jorstad family's predecessors who owed the property at the time), then the Brosas might have been

27

entitled to be compensated.[9] But as earlier observed, the Brosas signed a waiver of claims for damages in 1933 in anticipation of the construction of a new county road north of Paradise Creek and the order vacating Garrison Road states that the county commissioners had been petitioned to vacate the road. Under statutes then in effect, "ten freeholders residing in the vicinity of any county road" could petition the board of county commissioners to vacate and abandon all or part of the road on showing "that such county road will be useless as part of the county road system and that the public will be benefited by its vacation and abandonment." REM. REV. STAT. § 6450-49. Notice and a hearing was required, at which the board of county commissioners was required to consider "any . . . objection against such vacation and abandonment." REM. REV. STAT. § 6450-51. Only if the board unanimously found that "the county road is not useful and the public will be benefitted by the vacation" could it vacate and abandon the road. *Id.* The 1935 order vacating Garrison Road states that no objection to vacating the road was made.

---

[9] As the State points out, the subsequent purchaser doctrine bars Williams Place from prevailing in an inverse condemnation case for injuries resulting from government takings that occurred before its ownership. *See Crystal Lotus Enter. Ltd. v. City of Shoreline*, 167 Wn. App. 501, 505, 274 P.3d 1054 (2012). In addition, both Williams Place and its predecessor are presumed to have been compensated for all damages caused by prior takings. *Dickson v. City of Pullman*, 11 Wn. App. 813, 817-18, 525 P.2d 838 (1974). Because Williams Place insists that this action does not seek compensation for any taking prior to Jorstad family ownership, we need not discuss the subsequent purchaser doctrine or the presumption of prior compensation further.

Further authority that legislative action vacating a road ordinarily terminates all rights of use by an abutting owner is provided by *Bay Industry, Inc. v. Jefferson County*, 33 Wn. App. 239, 653 P.2d 1355 (1982). Bay Industry owned 40 acres at the terminus of a half-mile road that other abutting landowners wanted to have vacated. Ten landowners petitioned the county to vacate the road. Bay Industry objected, complaining that because a ravine crossed its property, the county road provided the only access to 30 of its 40 acres. Other reasons militated in favor of vacating the road, however, and as the appellate court observed:

> The statutory test [for vacating a road that is considered useless] is not whether the road is of use to anyone, but whether it is useful as part of the county system. The public to be benefited included all taxpayers of the county, who deserve to be relieved of the burden of maintaining a road of such limited utility.

*Id.* at 241-42. The appellate court affirmed the board of commissioners' decision to vacate the road.

Significantly, the appellate court in *Bay Industry* reversed one condition that the board of commissioners had imposed in its order vacating the road. The board had conditioned its order on a requirement that each of the petitioning landowners grant private easements along the former road to the power company, the fire department, and each other. Bay Industry argued, and the appellate court agreed, that as a matter of Bay Industry's constitutional right to equal protection it, too, was entitled to the benefit of the condition requiring grants of private easements.

29

If Bay Industry had enjoyed the private easement rights in the vacated road that Williams Place argues are held by *all* abutting landowners, it would never have been required to object to the vacation proceeding at all. It would not have been required to pursue an appeal in an effort to secure a private easement right on equal protection grounds.

Williams Place does not stand on the same footing as a landowner who buys real property with reference to a plat and has thereby essentially purchased a private easement. *Van Buren*, *Howell* and *Curtis* are inapposite.

While Williams Place principally relies on the *Van Buren* line of cases, it cites several other authorities that are also distinguishable. It cites an annotation, *Private Easement in the Way Vacated, Abandoned or Closed by Public*, 150 A.L.R. 645 (1944), which states the general rule that "[w]here a landowner has a private right-of-way in a strip of land which is or subsequently becomes a public street or highway, such private right is ordinarily held to survive the vacation or abandonment of the street or highway by the public." The general rule and the cases relying upon it depend upon there having been a private right-of-way that existed independent of the public highway. Williams Place asserts a right that is dependent on, not independent of, the former existence of Garrison Road as a public road.

Williams Place also cites *Humphrey v. Jenks*, 61 Wn.2d 565, 379 P.2d 366 (1963), which did not involve automatic vacation under the 1890 statute, but involved an

30

analogous issue of a pre-existing private easement. The parties in *Humphrey* owned adjacent properties originally served by a dedicated road running north and south along their east property line. The State later constructed a state highway further to the east, leaving most of the original street unneeded and unused as access. Some 18 years after the highway was constructed the Humphreys' predecessors, the Jenkses, and their neighbor to the north successfully petitioned the town to vacate and abandon the original street, which it did, after which the Jenkses placed a barrier across the original roadway on their property line with the Humphreys.

This presented a problem for the Humphreys. Given the grade of the state highway, the Humphreys could obtain access to the highway only by traveling on a driveway running along the east side of the Jenkses' property, which the Humphreys' predecessors had used ever since the highway was built. The driveway was located mostly in the highway right-of-way, but a portion (approximately 6' x 20') was located in the original, and now vacated, roadway east of the Jenkses.

The Humphreys succeeded in having a private easement right recognized in that 6' x 20' strip of the Jenkses' property, based in part on the court's recognition (citing *Van Buren* and *Howell*) that because the Humphreys' predecessors purchased with reference to a plat that laid out and dedicated the original roadway, the Humphreys enjoyed a private easement. *Humphrey* is therefore distinguishable from this case for the same reason as the *Van Buren* line of cases.

Because Williams Place has no private easement right arising from the former existence of Garrison Road as a public road, the trial court properly rejected that easement theory as a basis for avoiding summary judgment.

### B.    *Implied easement right*

Williams Place next argues that evidence supports an easement implied from prior use, arguing that it has demonstrated the required elements of (1) a unity of title and subsequent termination of two parcels of property, (2) apparent and continuous use of a quasi-easement for the benefit of one parcel to the detriment to the other during the unity of title, and (3) a reasonable degree of necessity for the existence of the easement after severance.  Br. of Appellant at 23, (citing *Landberg v. Carlson*, 108 Wn. App. 749, 757, 33 P.3d 406 (2001)).  The second and third elements aid in determining whether the grantor intended to grant or reserve an easement, whereas the first element, unity of title and subsequent separation, "is an absolute requirement." *Id.*

Here, the original owners of the two properties, Messrs. Pinnell and Collins, obtained title from the federal government.  In *Granite Beach, supra*, the court refused to consider common ownership by the United States as unity of title when analyzing whether an implied easement exists.  As the court explained, to view the federal government as impliedly reserving an easement in its favor that could be asserted by all future grantees "would make the mandatory element that a party establish common ownership at the date of severance meaningless—because all ownership of land in the

western states can be so traced." *Granite Beach*, 103 Wn. App. at 196.

Williams Place argues that it need not rely on the federal government as the common grantor because it can rely instead on the fact that "Garrison Road is the common parcel that was divided when it was vacated." Br. of Appellant at 23. It cites no Washington case holding that an easement may be implied when a legislative authority vacates a road and title reverts to the abutting landowners.

Both the nature of a public road and the reason a county acts to vacate it are antithetical to the concept of an implied easement. The "cardinal consideration" in implying the existence of an easement is the presumed intention of the parties, which is ordinarily gleaned from whether a quasi-easement has been continuously used for the benefit of one parcel and will be reasonably necessary to the benefitted party after severance. *Hellberg v. Coffin Sheep Co.*, 66 Wn.2d 664, 668, 404 P.2d 770 (1965). Does it even make sense to apply these elements when the property severed is a road and only a road? And when the legislative authority has ordered vacation and abandonment, do we even need to analyze the second and third elements of an implied easement to determine the county's intent?

No and no. It is fair to say that the separate parts of a road have been continuously used together, but not to benefit the road. And the fact that the road was vacated tells us unequivocally that the party Williams Place would characterize as the "common grantor"—Whitman County—considered the road useless and did not contemplate its

33

future use as a road. The circumstances under which a legislative authority vacates a road and its expectation in vacating it are completely at odds with the circumstances under which easements are implied. The trial court did not err in rejecting Williams Place's theory of an implied easement as a basis for avoiding summary judgment.

### C.    *Prescriptive easement right*

Williams Place next claims that the evidence supports an easement by prescription, given more than 70 years of use following the 1935 vacation. "To establish a prescriptive easement, a claimant must prove: (1) use adverse to the title owner; (2) open, notorious, continuous and uninterrupted use for 10 years; and (3) that the owner knew of the adverse use when he was able to enforce his rights." *Lee v. Lozier*, 88 Wn. App. 176, 181, 945 P.2d 214 (1997).

In 1950, the State acquired the land owned by the Jorstad family's and Motley's predecessors between Secondary Road No. 11 and the railroad right-of-way, in order to widen the highway. From 1950 on, then, the State owned the parcel of property that included the Paradise Creek bridge and the portions of the former Garrison Road that connected the bridge with Secondary Road No. 11 and ultimately with the property owned by the Jorstad family's predecessors. "[P]rescriptive easements do not lie against the state." *Northlake Marine Works, Inc. v. Dep't of Natural Res.*, 134 Wn. App. 272, 291, 138 P.3d 626 (2006) (citing RCW 7.28.090).

34

Williams Place provided the trial court with photographs and declarations that demonstrated genuine factual issues as to continual use, but it did not present evidence that the use had been adverse. "Easements by prescription are disfavored in the law because they effect a loss or forfeiture of the rights of the owner." *Kunkel v. Fisher*, 106 Wn. App. 599, 603, 23 P.3d 1128 (2001). Accordingly, "[w]hen one enters into the possession of another's property there is a presumption that he does so with the true owner's permission and in subordination to the latter's title." *Nw. Cities Gas Co. v. W. Fuel Co.*, 13 Wn.2d 75, 84, 123 P.2d 771 (1942).

Williams Place emphasizes that the presumption shifts upon "proof that the use by one of another's land has been open, notorious, continuous, uninterrupted, and for the required time," creating a presumption "that the use was adverse, unless otherwise explained." *Id.* at 85 (emphasis omitted). As this court recently recognized in *Gamboa v. Clark*, 180 Wn. App. 256, 321 P.3d 1236 (2014), however, some circumstances prevent a shift to a presumption of adverse use. For example, "evidence that a claimant has used a road on another's property that the property owner continues to use for its own purposes" overcomes this shift, and "'signifies only that the owner is permitting his neighbor to use the road in a neighborly way.'" *Id.* at 272 (quoting *Cuillier v. Coffin*, 57 Wn.2d 624, 627, 358 P.2d 958 (1961)).

Because Williams Place failed to demonstrate a genuine issue of fact that Williams Place's or its predecessor's use of the bridge was adverse and hostile, the trial court

35

properly rejected its theory of a prescriptive easement as a basis for avoiding summary judgment.

### D.    *Easement of necessity*

Williams Place next asserts an easement of necessity, citing *Dawson v. Greenfield*, 118 Wash. 454, 203 P. 948 (1922), but fails to offer argument beyond that citation. As pointed out by WSDOT, *Dawson* holds that an implied easement by necessity can be found where a common grantor sells a portion of the property that, without an easement, would be landlocked. Because Williams Place failed to demonstrate any genuine issue of fact supporting the requirement of a common grantor, the trial court properly rejected the theory of an easement by necessity as a basis for avoiding summary judgment.

### *IV.  Right as a nonabutting landowner presenting special circumstances as in Union Elevator*

As an alternative to its arguments that it had rights as an abutting owner, Williams Place argues that it has a right to reasonable, adequate, and commercially practicable access under this court's holding in *Union Elevator*, *supra*.

In *Union Elevator*, this court held that a nonabutting landowner would be entitled to compensation if he were able to show that by closing an access to a public road, the State physically impaired his access in a way that was different in kind from that suffered by the general public and left him with no reasonable access. *Id.* at 295-96. The case involved a project to upgrade a two-lane partial access control highway to a four-lane full

access facility, which resulted in the closure of an intersection that had served as the route from the highway to one of Union's grain elevators. With the closing of the intersection, drivers had to reach the grain elevator on a route that included steep grades, multiple 90 degree turns and deep, narrow ditches along the shoulders—driving conditions particularly difficult for fully-loaded grain trucks. Union Elevator filed an inverse condemnation action, alleging the State's action "completely [took] and destroy[ed] all practical, reasonable, and economically viable use" of the affected grain elevator. 96 Wn. App. at 292.

The trial court dismissed the suit on summary judgment, finding as a matter of law that Union Elevator still had "access" within the meaning of RCW 47.52.041 and .080, provisions of the limited-access highway code, with the result that statutory compensation was not payable. It found no merit to Union Elevator's constitutional claim to just compensation "because there is no physical impairment of its access different in kind from that of the general public." 96 Wn. App. at 293.

On appeal, this court began its analysis by observing that "this is a fact-driven case." *Id.* at 295. It recognized that "compensation for nonabutting property owners, at least as it relates to access issues, is usually denied," but that "nonabutting property owners do, on occasion, have protected access rights." *Id.* at 295. It cited and quoted from *State v. Wineberg*, 74 Wn.2d 372, 375-76, 444 P.2d 787 (1968) in which the Washington Supreme Court concluded that a property owner complaining of lost access

37

was not entitled to compensation, but only because he failed to show that "reasonable means of access" had been obstructed and that he had "suffered special damage[s] different in kind, and not merely degree, from that sustained by the general public." *Id.* at 376.

This court concluded that Union Elevator, by contrast, demonstrated that the State's closure of the intersection on which its operations relied may have resulted in "a total loss of safe, reasonable, and adequate access" to its facility, causing "the complete destruction of its business and real property values"—damage that the court stated was "certainly different in kind from that sustained by the general public." *Union Elevator* at 296.

Unlike the State action of closing a public access to the highway in *Union Elevator*, the State action complained of in this case was that WSDOT directed Motley to take out its temporarily-approved bridge. We have already concluded that Williams Place had no property interest in the former Garrison Road route. While Union Elevator could point to State closing of an operating intersection, Williams Place cannot identify an existing legal right of access that WSDOT cut off in 2007.

And here, unlike the situation faced by Union Elevator, Williams Place can apply for access at the location of the easement it has obtained over or under the Chipman Trail. *See* RCW 47.50.010, WAC 468-51-030. The record shows that WSDOT has consistently expressed willingness to grant Williams Place an access permit at that location, provided

the connection meets the applicable statutory and regulatory requirements.[10] Where a

landowner is able to build a roadway providing ingress and egress, any inconvenience in

doing so is a loss that does not give rise to an action for damages against the person

causing it. *Hoskins v. City of Kirkland*, 7 Wn. App. 957, 962-63, 503 P.2d 1117 (1972).

As explained in *Hoskins*,

> a landowner whose land becomes landlocked or whose access is
> substantially impaired as a result of a street vacation is said to sustain
> special injury. If, however, the landowner still retains an alternate mode of
> egress from or ingress to his land, even if less convenient, generally
> speaking he is not deemed specially damaged. He has no legal right to
> prevent the vacation because no legal right of his has been invaded.

*Id.* at 960-61 (internal citations omitted).

Because Williams Place failed to demonstrate a genuine issue of fact either that

WSDOT's actions in 2007 deprived it of an existing right of access to SR 270 or that it is

left with no means of safe, reasonable, and adequate access, the trial court properly

rejected its reliance on *Union Elevator* as a basis for avoiding summary judgment.

### V. Equitable estoppel

Finally, Williams Place contends that WSDOT is equitably estopped from denying

the existence and its use of an access right along former Garrison Road. The doctrine of

---

[10] Williams Place also presently enjoys access to its property from SR 270
through the property of its neighbor to the west, the Thonneys. While that access is only
permissive, WSDOT fairly characterizes it as "not unlike the permissive access Williams
Place used prior to the removal of the temporary bridge." Br. of Resp't at 23.

equitable estoppel is based on the principle that "a party should be held to a representation made or position assumed where inequitable consequences would otherwise result to another party who has justifiably and in good faith relied thereon." *Wilson v. Westinghouse Elec. Corp.*, 85 Wn.2d 78, 81, 530 P.2d 298 (1975).

Establishing equitable estoppel requires proof of "(1) an admission, act or statement inconsistent with a later claim; (2) another party's reasonable reliance on the admission, act or statement; and (3) injury to the other party which would result if the first party is allowed to contradict or repudiate the earlier admission, act or statement." *Dep't of Ecology v. Campbell & Gwinn, L.L.C.*, 146 Wn.2d 1, 20, 43 P.3d 4 (2002). Because equitable estoppel against the government is not favored, application of the doctrine when asserted against the government must also be "necessary to prevent a manifest injustice," and must not "impair the exercise of government functions." *Id.* at 20; *Kramarevcky v. Dep't of Soc. & Health Servs.*, 122 Wn.2d 738, 744, 863 P.2d 535 (1993). "A party asserting equitable estoppel against either the government or a private party must prove each element of estoppel with clear, cogent and convincing evidence." *Id.*

Williams Place contends that since 1970, WSDOT has "repeatedly acknowledged" both the existence and the use by Williams Place of the former Garrison Road as access. WSDOT persuasively argues that the four pieces of evidence relied upon by Williams Place as WSDOT's "acknowledgment" are not inconsistent with its present position that

40

Williams Place and its predecessors enjoyed permissive use at times and that Motley's predecessor in 1970—like Williams Place today—had a statutory right to apply for a highway access permit.

We need not analyze Williams Place's evidence in detail, however, because whether Williams Place had a right of access at milepost 6.9 is an issue of law, not an issue of fact. As this court explained in *Pacific Land Partners v. Dep't of Ecology*, "[e]quitable estoppel does not apply to statements that are issues of law, even when the statement of law is incorrect." *Pac. Land Part.*, 150 Wn. App. 740, 751, 208 P.3d 586 (2009) (holding that the Department of Ecology (DOE) was not estopped from arguing that the water right was relinquished before the landowner bought the property); *Dep't of Ecology v. Theodoratus*, 135 Wn.2d 582, 600, 957 P.2d 1241 (1998) (DOE was not estopped from using actual beneficial use of water to quantify water right, as its prior representation that the water right could be quantified by system capacity was an incorrect statement of law).

The trial court properly rejected Williams Place's theory of equitable estoppel as a basis for avoiding summary judgment.

## VI.    Attorney fees

Williams Place requests an award of attorney fees and costs under RAP 18.1, RCW 8.25.070, and RCW 8.25.075. Because it is not the prevailing party on appeal, it is not entitled to an award of fees or costs.

41

No. 31681-5-III
*Williams Place v. State*

WSDOT requests costs, including statutory attorney fees, under RAP 18.1 and RCW 4.84.080. As the substantially prevailing party under RAP 14.2 and RAP 14.3, WSDOT is entitled to costs.

Affirmed.

_____
Siddoway, C.J.

WE CONCUR:

_____
Korsmo, J.

_____
Fearing, J.

42